**[J-133-2016 and J-134-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| SUGARHOUSE HSP GAMING, L.P., | : | No. 124 EM 2016 |
| | : | |
| Petitioner | : | Appeal from the Supplemental |
| | : | Adjudication of the Pennsylvania |
| | : | Gaming Control Board in the matter of |
| v. | : | the Applications for the Category 2 Slot |
| | : | Machine License in the City of the First |
| | : | Class, Philadelphia, dated June 23, |
| PENNSYLVANIA GAMING CONTROL | : | 2016 |
| BOARD, | : | |
| | : | SUBMITTED: November 7, 2016 |
| Respondent | : | |
| | : | |
| STADIUM CASINO, LLC, | : | |
| | : | |
| Intervenor | : | |
| | | |
| MARKET EAST ASSOCIATES, LP, | : | No. 125 EM 2016 |
| | : | |
| Petitioner | : | Appeal from the Supplemental |
| | : | Adjudication of the Pennsylvania |
| | : | Gaming Control Board in the matter of |
| v. | : | the Applications for the Category 2 Slot |
| | : | Machine License in the City of the First |
| | : | Class, Philadelphia, dated June 23, |
| PENNSYLVANIA GAMING CONTROL | : | 2016 |
| BOARD, | : | |
| | : | |
| Respondent | : | SUBMITTED: November 7, 2016 |
| | : | |
| STADIUM CASINO, LLC, | : | |
| | : | |
| Intervenor | : | |

**OPINION**

**JUSTICE TODD**                                    **DECIDED: June 20, 2017**

These matters return to us following our prior decision on March 29, 2016, in which we affirmed in part, and vacated in part, the November 18, 2014 order of the Pennsylvania Gaming Control Board ("Board") — awarding the last remaining Category 2 slot machine license provided for by the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act")[1] to applicant Stadium Casino, L.L.C ("Stadium") — and remanded this matter to the Board for the limited purpose of addressing two issues: (1) whether Watche Manoukian, an individual who is an affiliate of Stadium, was eligible to apply for a Category 1 slot machine license at the time of Stadium's application for the Category 2 license, in violation of Section 1304(a)(1) of the Gaming Act;[2] and (2) whether, after the issuance of the Category 2 license to Stadium, Manoukian will possess a financial interest in that entity greater than 33.3%, in violation of Section 1330 of the Gaming Act.[3] *See SugarHouse HSP Gaming, LP v. Pennsylvania Gaming Control Board*, 136 A.3d 457 (Pa. 2016) ("*SugarHouse I*").[4] The Board issued a "Supplemental Adjudication" on June 23, 2016, in which both issues were addressed.

SugarHouse HSP Gaming ("SugarHouse"), the present holder of a Category 2 slot machine license for a casino it operates in Philadelphia, and Market East Associates, L.P. ("Market East"), an unsuccessful applicant for the Category 2 license awarded to Stadium, have both filed petitions for review from that Supplemental Adjudication.[5] After careful consideration, we dismiss SugarHouse's petition for review, docketed at 124 EM 2016, finding it was not entitled to intervene in the proceedings on

---

[1] 4 Pa.C.S. §§ 1101-1904.
[2] 4 Pa.C.S. § 1304.
[3] 4 Pa.C.S. § 1330.
[4] As we explained in that opinion, the Gaming Act establishes three separate categories of slot machine licenses, Category 1, Category 2, and Category 3, and it specifically provided that two Category 2 slot machine licenses were to be issued for the City of Philadelphia. *SugarHouse I*, 136 A.3d at 461; 4 Pa.C.S. § 1301-1305.
[5] We have consolidated these petitions for purposes of conducting our review.

remand. In Market East's petition for review, docketed at 125 EM 2016, we affirm the Board's determination that Manoukian was not eligible to apply for a Category 1 slot machine license at the time of Stadium's application for its Category 2 license, and, thus, that Section 1304(a)(1) would not be violated by the issuance of a Category 2 license to Stadium. However, we reverse the Board's determination of what constitutes a "financial interest" as that term is used in Section 1330, and we define that term herein. Because the Board has admitted that it has not determined the nature of the specific "equity infusion" Manoukian will supply post-licensure to the trust which has an ownership interest in Stadium, we presently cannot affirm the Board's conclusion that Manoukian will not be in violation of Section 1330's 33.3% limit on the possession of a financial interest in a Category 2 slot machine licensee by another slot machine licensee. Thus, we again remand for further proceedings consistent with this opinion.

## I. Background

To briefly recap the factual history of this matter, a more detailed recitation of which may be found in *SugarHouse I*, in 2006, the Board awarded one of the two Category 2 licenses allotted under the Gaming Act for Philadelphia to SugarHouse, which, in 2010, opened an "interim" casino located on the eastern side of Philadelphia near the Delaware River. In 2014, SugarHouse commenced construction of an expansion of this facility at that location, which has since been completed and is currently in operation.

Initially, the Board awarded the second Category 2 license for Philadelphia to Foxwood Casino; however, in 2010, the Board revoked this license due to Foxwood's inability to raise the necessary money to build the facility, and the Board reopened the application process. Thereafter, four entities, including Stadium and Market East, filed applications with the Board seeking licensure, and the Board conducted background

investigations of each of the applicants to determine whether they met the Gaming Act's eligibility and financial requirements for the issuance of a Category 2 license. After this process was complete, in 2013, the Board conducted a series of public suitability hearings to consider the merits of each application.

Before these hearings commenced, SugarHouse filed a petition with the Board to intervene, advancing three contentions relevant to this appeal as to why, in its view, the license should not be granted: (1) the granting of a second slot machine license would result in the alleged saturation of the Philadelphia area gaming market and cause SugarHouse economic harm through the dilution of its gaming revenues; (2) Stadium was precluded from being awarded a Category 2 license by Section 1304 of the Gaming Act because one of its affiliates already was the owner or operator of a facility which had a Category 1 slot machine license; and (3) that "affiliates, owners, or financial backers" of Stadium, Market East, and other applicants owned or had a financial interest in other existing licensed gaming facilities potentially greater than the 33.3% share permitted by Section 1330 of the Gaming Act, which would preclude those applicants from receiving a Category 2 license. SugarHouse Petition to Intervene, 12/16/13, at 11. The Board granted SugarHouse limited intervention, restricted to the issue of market saturation, but denied its intervention as to the remaining issues.

After reviewing all of the evidence which had been submitted to it, on November 18, 2014, the Board, at an open public hearing, voted 7-0 to award the Category 2 license to Stadium, and it issued an order to that effect on the same day. *See* Gaming Board Order, 11/18/14. This order incorporated, by reference, the reasons for the Board's approval which it set forth in a separate Adjudication, also issued on November 18, 2014. *Id.* In the Adjudication, the Board explained that it selected Stadium based on a variety of factors such as its proposed facility's accessibility, proximity to other

casinos, impact on the surrounding community, traffic flow, past positive history of its management group in the gaming and entertainment industry, and the ability of Stadium's ownership group to self-finance the construction of the facility.

Both SugarHouse and Market East filed petitions for review with our Court from the Board's November 18, 2014 order, which we consolidated for disposition.[6] In its petition, SugarHouse raised four claims: (1) the Board erred as a matter of law or acted arbitrarily and capriciously in limiting SugarHouse's intervention in Board proceedings to the question of market saturation; (2) the award of the license to Stadium would result in undue economic concentration in violation of Section 1102(5)[7] of the Gaming Act and the Board's regulations; (3) the award of the license to Stadium would violate the provisions of Section 1304 of the Gaming Act barring dual ownership and control of a Category 1 and a Category 2 licensed facility; and (4) renewing its argument that the award of the license to Stadium would violate Section 1330 of the Gaming Act, because it would result in its affiliates, who already possessed a slot machine license, owning or controlling more than 33.3% of a second casino.

We rejected SugarHouse's challenge to the Board's limitation of its intervention.[8] We ruled that, because SugarHouse had a "substantial, direct, and immediate" interest

---

[6] Our Court has exclusive appellate jurisdiction over appeals from "any final order, determination or decision of the board involving the approval, issuance, denial or conditioning of a slot machine license or the award, denial or conditioning of a table game operation certificate." 4 Pa.C.S. § 1204.

[7] 4 Pa.C.S. § 1102(5).

[8] Our standard of review in these matters requires our Court to

> affirm all final orders, determinations or decisions of the board involving the approval, issuance, denial or conditioning of a slot machine license or the award, denial or conditioning of a table game operation certificate unless it shall find that the board committed an error of law or that the order, determination or decision of the board was arbitrary and there was a capricious disregard of the evidence.

4 Pa.C.S. § 1204.

in the outcome of the licensing proceedings greater than that held by the general public at large — namely, suffering possible financial detriment from the improper granting of a license to a competitor if the Board did not adequately weigh the statutory requirement that it consider the prospect of market saturation in its award of the second license, and because none of the other parties were pursuing this issue before the Board — SugarHouse was properly granted intervention in the licensing proceedings by the Board under its regulations governing intervention. *See SugarHouse I*, 136 A.3d at 470; *see also* 58 Pa. Code § 441a.7(z)(2) ("A person may file a petition to intervene [in a licensing hearing for a slot machine license] if the person has an interest in the proceeding which is substantial, direct and immediate and if the interest is not adequately represented in a licensing hearing."). However, SugarHouse did not present any argument in its brief to our Court on that issue. *SugarHouse I*, 136 A.3d at 470.

By contrast, regarding SugarHouse's other issues, because they were raised and pursued by the other parties before the Board, and since the Board also received evidence on these questions from its own Bureau of Investigations and Office of Enforcement Counsel, we found no legal error, nor any arbitrary or capricious disregard of competent evidence by the Board, in denying SugarHouse's intervention as to these matters. We further noted that, in any event, Appellant Market East had raised the same challenges in its petition for review and continued to argue them in its appellate brief, rendering SugarHouse's arguments duplicative; hence, for all of these reasons, our Court did not address the other issues raised by SugarHouse.

Addressing the issues Market East raised on appeal, we first rejected its claim that the Board failed to consider and explicitly analyze certain evidentiary factors, which it averred established that the award of the license to Stadium would result in undue

concentration of economic opportunities in violation of Section 1102(5). We, therefore, affirmed the Board's ruling on this issue. *Id.* at 474-75.

Our Court next considered the question of whether Stadium was eligible to apply for a Category 2 license under Section 1304 of the Gaming Act which provides, in relevant part: "A person may be eligible to apply for a Category 2 license if the applicant, its affiliate, intermediary, subsidiary or holding company is not otherwise eligible to apply for a Category 1 license." 4 Pa.C.S. § 1304(a)(1). Market East contended that Stadium was disqualified under this section because its affiliate, Manoukian, was, at the time of Stadium's application, "eligible to apply for a Category 1 license," due to the fact he had an 85% ownership interest in an entity known as Greenwood Racing ("Greenwood"), which is the parent company of Category 1 license holder Parx Casino.

The crux of Market East's argument in this regard was that, because a Category 1 license holder had to reapply for the renewal of that license prior to its expiration, both it, and any of its affiliates, must be deemed eligible to apply for the license as if they were applying for it the very first time. We rejected this claim based on the Gaming Act's differing requirements for the issuance of a slot license and the renewal of said license, as well as the Act's definition of applicant. *SugarHouse I*, 136 A.3d at 478 (citing 4 Pa.C.S. §§ 1103, 1325(a), 1326(a)). However, we noted that these statutory provisions did not establish the eligibility requirements to apply for a Category 1 license; rather, those requirements are set forth in Section 1302 of the Gaming Act.[9]

Noting that Section 1302, by its terms, does not disqualify a Category 1 licensee or any of its affiliates from applying for another Category 1 license for a separate racetrack facility, we recognized that Manoukian, even though an affiliate of a Category

---

[9] 4 Pa.C.S. § 1302, set forth in full *infra*.

1 license holder Parx Casino, was, nevertheless, potentially eligible to apply for another Category 1 license for another racetrack facility in the Commonwealth. Due to the fact that such eligibility would arguably trigger disqualification for the issuance of a Category 2 license under the prohibitory language of Section 1304(a)(1), and because we agreed with Market East's contention that the Board did not sufficiently explain its consideration of this statutory provision in its Adjudication, we remanded the matter to the Board to address, in the first instance, whether Manoukian was, in fact, eligible to apply for a Category 1 license at the time of Stadium's application. *SugarHouse I*, 136 A.3d at 478.

Our Court next examined Market East's contention that Stadium's proposed post-licensure ownership structure[10] violated Section 1330 of the Gaming Act, which states:

> No slot machine licensee, its affiliate, intermediary, subsidiary or holding company may possess an ownership or financial interest that is greater than 33.3% of another slot machine licensee or person eligible to apply for a Category 1 license, its affiliate, intermediary, subsidiary or holding company.
>
> * * *
>
> No such slot machine license applicant shall be issued a slot machine license until the applicant has completely divested its ownership or financial interest that is in excess of 33.3% in another slot machine licensee or person eligible to apply for a Category 1 license, its affiliate, intermediary, subsidiary or holding company.

---

[10] Under this structure, described in *Sugarhouse I*, Stadium will be owned in equal shares by two limited liability corporations: Stadium Casino Investors and Stadium Casino Baltimore Investors. 66% of Stadium Casino Investors will, in turn, be owned by Greenwood and 34% by an entity known as the Sterling Investors Trust, an irrevocable trust created by Manoukian. Sterling Fiduciary Services, Inc. ("Sterling Fiduciary"), a limited liability corporation, is the trustee of Sterling Investors Trust. Post-licensure, Manoukian will own 28% of the shares of Sterling Fiduciary, with the other 72% of the shares held by other members of his family. *Sugarhouse I*, 136 A.3d at 464-65. Three of Manoukian's family members, their spouses, and their children are the designated beneficiaries of the Trust; however, Manoukian is not. Supplemental Adjudication, 6/23/16, at 10-11.

4 Pa.C.S. § 1330.

Market East argued that the Board engaged in no meaningful analysis in its Adjudication of whether Manoukian's interests in Stadium, through his interests in Sterling Fiduciary, violated the requirements of Section 1330. Market East took the position that, because Manoukian's family members held all of the ownership shares in Sterling Fiduciary not owned by Manoukian, Manoukian's business ally occupied all of the corporate officer positions of Sterling Fiduciary, and because Manoukian pledged an "equity infusion" of $34 million[11] to Sterling Investors Trust, which would be used as capital by Stadium, this raised the question of whether the trust was being used by Manoukian to evade the requirements of Section 1330 by making it appear that his total interest in Stadium through Sterling Fiduciary and Greenwood was below the 33.3% limit imposed by that Section. Because Section 1330 expressly permits a license applicant to divest any ownership or financial interest prior to the issuance of a license in order to comply with this statute, we agreed with the Board that the relevant ownership structure of a Category 2 license applicant was that which the applicant would have post-licensure.

Although our Court found no fault with the Board's calculation of Manoukian's ultimate *ownership* interests in Stadium through Sterling Financial under Section 1330, we noted that the language of this section additionally required the Board to examine the percentage of "*the financial interest* that an existing license holder will possess in a licensee after the license is issued." *SugarHouse I*, 136 A.3d at 481 (emphasis original and footnote omitted). Market East argued to our Court that the Board's Adjudication

---

[11] The Board describes this equity infusion as being "provided from Watche Manoukian's personal funds," but, as discussed *infra*, the Board does not specify how this money would be transferred from Manoukian to the trust, *e.g.*, by loan or gift. Supplemental Adjudication, 6/23/16, at 10.

did not sufficiently support its apparent conclusion that Manoukian's financial interest in Stadium was also within the 33.3% limit of Section 1330,[12] and Market East further highlighted in its confidential brief to our Court its concerns over the equity infusion pledged by Manoukian to Sterling Investors Trust, which will, in turn, be used by the trust to purchase an interest in Stadium. Because the Board's Adjudication did not address these matters, we remanded to the Board to explicate whether Manoukian, post-licensure, would possess a financial interest in Stadium which exceeds that section's 33.3% limit on financial interests. *SugarHouse I*, 136 A.3d at 481. Due to the fact that the definition of financial interest as used in Section 1330 was integral to the Board's consideration of this issue, we additionally directed the Board, as the administrative agency charged with interpreting the Gaming Act, to articulate how it defined that term. *Id.* at 481 n.30.

We, thus, affirmed in part, and vacated in part, the Board's order of November 18, 2014, and issued both a public remand order and a separate sealed version of that order to protect certain confidential personal information provided to the Board which is not a matter of public record. Both versions of the remand order directed the Board to conduct "further proceedings" to address the two matters discussed above.[13]

---

[12] *See* Market East Brief (Public Version) in *SugarHouse I* at 17 ("[T]he Board offered no substantive support for its apparent conclusion that Manoukian's ownership *or financial interest* in Stadium passes muster under section 1330, instead mostly relegating the issue to footnotes to the Adjudication." (emphasis added)).

[13] The public order stated in full:

> **AND NOW,** this 29th day of March, 2016, for the reasons expressed in the accompanying Opinion, the Order of the Gaming Control Board Court is hereby **AFFIRMED** in part, **VACATED** in part, and the matter is **REMANDED** for further proceedings on the following issues. First, regarding the question of the eligibility of Stadium Casino, LLC ("Stadium") to apply for a Category 2 slot machine license under 4 Pa.C.S. § 1304(a), the Board is directed to consider whether Watche Manoukian, as an affiliate of Stadium, was eligible

(continued...)

On June 8, 2016, the certified record in this case was remanded to the Board. Thereafter, on June 23, 2016, the Board issued a Supplemental Adjudication in which it determined "that adequate factual basis exists within the record of the proceedings before it, as well as within official records of the Board, to address [the remanded] issues. As such, an additional hearing for the purpose of taking further evidence is not necessary." Supplemental Adjudication, 6/23/16, at 4-5. Based on the extensive evidentiary record, which had been previously developed during the licensing proceedings, its prior 2014 Adjudication, and its taking of judicial notice of matters published in the Pennsylvania Bulletin,[14] the Board first found that neither Manoukian, nor any other affiliate, intermediary, or holding company of Stadium was otherwise eligible to apply for a Category 1 slot machine license, and, consequently, that Section 1304 would not be violated by the issuance of a Category 2 license to Stadium. Second, the Board elucidated its definition of what it considered to be a financial interest under Section 1330, and found that, under that definition, Manoukian will not have a

---

(...continued)

> to apply for a Category 1 slot machine license at the time Stadium applied for the Category 2 slot machine license which is the subject of this appeal. Second, the Board is directed to consider whether the financial interest, if any, Manoukian may have in Stadium due to certain financial transactions and commitments of financial support he made during the application process violates the prohibitions in 4 Pa.C.S. § 1330. Specifically, the Board should consider whether Manoukian, by virtue of his pledged commitment to {redacted} or through any other financial transaction, would possess, post-licensure, a financial interest in Stadium in excess of the 33.3% threshold established by Section 1330.

*SugarHouse I*, 136 A.3d 457 (Pa. 2016) (public order).

[14] *See Riverwalk Casino, LP v. Pennsylvania Gaming Control Board*, 926 A.2d 926, 935 (Pa. 2007) (observing that "the Gaming Board serves as a quasi-judicial body with fact-finding and deliberative responsibilities.").

financial interest in Stadium, post-licensure, greater than 33.3%.[15]  The Board, thus concluded, based on its prior Adjudication, that its November 18, 2014 order awarding the Category 2 license to Stadium was "supported by the extensive evidentiary record and consistent with the relevant provisions of the Gaming Act." *Id.* at 23.

The same day the Board issued its Supplemental Adjudication, SugarHouse filed a petition to intervene with the Board, requesting that it be granted "full party status as an Intervener in the proceedings on remand."  SugarHouse Petition to Intervene, 6/23/16, at 1.  SugarHouse sought to "raise and present . . . matters" pertaining to the questions that we directed the Board to answer on remand. *Id.* at 4.  As per the Board's rules of procedure, Sugarhouse's petition to intervene was referred to the Board's Office of Hearings and Appeals ("OHA"), to which, as explained more fully herein, the Board has assigned responsibility for the disposition of "all matters, except for hearings under § 441a.7 (relating to licensing hearings for slot machine licenses)."  58 Pa. Code § 491a.8.

On June 29, 2016, a Board hearing officer returned the petition by mail to counsel of record for SugarHouse, along with the accompanying explanatory letter:

> We are returning the *Petition* and marking the proceeding where it was docketed (OHA Docket No. 4745-2016) closed. Upon review of the *Petition*, it was determined that the relief sought ("the right to intervene and participate in the Proceedings on Remand") could not be granted because, in fact, the Board held no additional proceedings on remand as it relied upon the existing evidence of record.

Letter from Board Hearing Officer Kenneth Zielonis, 6/29/16 (emphasis original). Thereafter, on July 22, 2016, SugarHouse filed a petition for review in our Court,

---

[15]  The specific rationale of the Board in arriving at these conclusions will be further elaborated, *infra*, in our discussion of the issues we are addressing in this appeal.

docketed at 124 EM 2016, and Market East subsequently filed a petition for review, docketed at 125 EM 2016, on July 27, 2016.

In response to SugarHouse's petition, the Board filed an application for relief with our Court, asserting that SugarHouse's petition should be "quashed and dismissed, inasmuch as our Court, in *SugarHouse I*, previously upheld the Board's limitation of SugarHouse's intervention in the licensing process to the subject of market saturation. Board Application for Relief, 8/12/16, at 1. After SugarHouse filed an answer to the application, our Court entered an order deferring action on the application and directing the parties to address this question in their respective briefs. *See SugarHouse HSP Gaming v. Pa. Gaming Control Board*, 124 EM 2016 (Pa. filed Sept, 13, 2016) (order).

## II. Analysis

SugarHouse and Market East raise the following issues in their briefs:

### Appeal of SugarHouse at 124 EM 2016, J-133-2016:[16]

> 1. Did the Board err as a matter of law, or at the very least act arbitrarily and with a capricious disregard of the evidence, when it failed to even consider, much less grant, SugarHouse's pending Petition to Intervene on Remand before issuing the Supplemental Adjudication?
>
> 2. Did the Board err as a matter of law, or at the very least act arbitrarily and with a capricious disregard of the evidence, when it denied SugarHouse due process by failing to give it notice and an opportunity to be heard before issuing the Supplemental Adjudication?
>
> 3 Did the Board err as a matter of law, or at the very least act arbitrarily and with a capricious disregard of the evidence, in issuing its Supplemental Adjudication when it failed to comply with this Court's March 29, 2016 Remand Order?

---

[16] These issues have been reordered for ease of consideration.

4. Did the Board err as a matter of law, or at the very least act arbitrarily and with a capricious disregard of the evidence, when it issued its Supplemental Adjudication in violation of the Pennsylvania Sunshine Act?

SugarHouse Brief (J-133-2016) (Public Version) at 5-6.

***Appeal of MarketEast 125 EM 2016, J-134-2016:***

1. Did the Board commit an error of law in confirming its award of the License to Stadium without actually conducting further proceedings as specifically directed by this Court's March 29, 2016 Order vacating in part the Board's original order granting the License to Stadium?

2. Did the Board commit an error of law in confirming its award of the License to Stadium because granting the license to Stadium violates Section 1330 of the Gaming Act, 4 Pa.C.S. § 1330, which prohibits a slot machine licensee, its affiliate, intermediary, subsidiary, or holding company from possessing an ownership or financial interest greater than 33.3% of another slot machine licensee or person eligible to apply for a Category 1 license, its affiliate, intermediary, subsidiary, or holding company, and by adopting an impermissibly narrow definition of what constitutes a "financial interest" under this section of the Gaming Act with respect to Watche Manoukian?

3. Did the Board commit an error of law in confirming its award of the License to Stadium even though granting the License to Stadium violates Section 1304(a)(1) of the Gaming Act, 4 Pa.C.S. § 1304(a)(1), which makes Stadium ineligible for a Category 2 license because an entity is only eligible to apply for a Category 2 license if the applicant, its affiliate, intermediary, subsidiary or holding company is not otherwise eligible to apply for a Category 1 license?

Market East Brief (J-134-2016) (Public Version) at 9-10.[17]

---

[17] Stadium, as a party to the licensing proceedings below, has intervened in this appeal as a matter of right and has filed a brief in support of the Board's Supplemental Adjudication. *See* Pa.R.A.P. 1531 ("A party to a proceeding before a government unit that resulted in a quasijudicial order may intervene as of right in a proceeding under this chapter relating to such order by filing a notice of intervention (with proof of service on (continued...)

### A. Appeal of SugarHouse at 124 EM 2016, J-133-2016

We first consider the contentions of the Board that SugarHouse's appeal should be quashed or dismissed, which we directed the parties to brief.

**1. Waiver.**

The Board first argues that SugarHouse has waived any right to appeal due to the fact that it failed to exhaust its administrative remedies before the Board prior to the filing its petition for review. The Board contends that, under the Administrative Code, which supplements the Board's regulations, whenever a subordinate to the agency head takes an action pursuant to his or her delegated authority, the affected party has 10 days to file a petition seeking review from the agency head. Because the OHA hearing officer returned the petition to intervene to SugarHouse, and as SugarHouse did not seek further review of this action with the Board, it has waived all of its appellate arguments in the current appeal.

SugarHouse responds by averring that the Board's argument "misses the mark." SugarHouse Reply Brief (J-133-2016) (Public Version) at 24. In SugarHouse's view, because the Hearing Officer did not address its intervention petition, but simply rejected and returned the petition, it was performing a mere "ministerial action" at the Board's direction in the capacity of a surrogate; hence, it posits that the act of the Hearing Officer is attributable to the Board and, thus, is required to be appealed directly to this Court. However, according to SugarHouse, if the Hearing Officer was acting of his own initiative and without authorization from the Board, then his purported rejection of the appeal is a nullity, and the Board's decision is immediately appealable.

---

(...continued)
all parties to the matter) with the prothonotary of the appellate court within 30 days after notice of the filing of the petition for review.").

A claim that appellate issues are waived for failing to raise them in the first instance with the Board involves a question of law, and, thus, our standard of review is *de novo*. *Pocono Manor Investors, LP v. Pennsylvania Gaming Control Board*, 927 A.2d 209, 216 (Pa. 2007). The Board's argument implicates the concept of "*Dilliplaine* waiver," a doctrine arising from our seminal case of *Dilliplaine Valley v. Lehigh County Trust*, 322 A.2d 114 (Pa. 1974), wherein our Court abrogated the prior and long-standing jurisprudential rule that an appellate court could consider claims of trial court error which are "basic and fundamental," even though no timely objection to the alleged error was made to the trial court. *Id.* at 216-17. Informing our decision to abrogate this rule, we identified two principal benefits of requiring objections to be preserved through initial presentation to a lower tribunal: (1) a timely objection made to the trial court gives that court the opportunity to take immediate corrective action, which promotes efficiency in the judicial process by allowing litigants to avoid incurring unnecessary expense and delay by being forced to resort to the appellate process; and (2) it offers a predictable and neutral standard for appellate review of claims of trial court error which is applicable to all cases, unlike the former standard which was inconsistently applied by appellate courts on a case by case basis. *Id.* at 117.

Thereafter, our Court applied the rationale of *Dilliplaine* to administrative proceedings and ruled that a claim could be waived for purposes of appellate review for failure to present it to the administrative tribunal which rendered a final decision in the matter:

> [T]he administrative law tribunal must be given the opportunity to correct its errors as early as possible; diligent preparation and effective advocacy before the tribunal must be encouraged by requiring the parties to develop complete records and advance all legal theories; and the finality of the lower tribunals' determinations must not be eroded by treating each determination as part of a sequence of piecemeal adjudications.

*Wing v. Commonwealth Unemployment Compensation Board of Review*, 436 A.2d 179, 181 (Pa. 1981). These precepts have been codified in Rule 1551 of the Pennsylvania Rules of Appellate Procedure governing petitions for review from administrative tribunals, which provides, in relevant part:

> **(a) Appellate jurisdiction petitions for review.** Review of quasijudicial orders shall be conducted by the court on the record made before the government unit. No question shall be heard or considered by the court which was not raised before the government unit except:
>
> (1) Questions involving the validity of a statute.
> (2) Questions involving the jurisdiction of the government unit over the subject matter of the adjudication.
> (3) Questions which the court is satisfied that the petitioner could not by the exercise of due diligence have raised before the government unit . . . .

Pa.R.A.P. 1551(a).

Subsequently, however, our Court specified that waiver of a particular issue for failure to raise it before an administrative tribunal is not *required* by *Dilliplaine* itself; rather, *Dilliplaine* merely *permits* an administrative agency to adopt an issue preservation requirement through its own rules of procedure. *Goods v. Pennsylvania Board of Probation and Parole*, 912 A.2d 226, 235-36 (Pa. 2006). As a result, only if a statute or an administrative tribunal's rules of procedure afford the opportunity for an issue to be presented to the tribunal so that it may render a decision on it, and also provide notice that an issue will be waived for failure to properly raise and preserve it in a manner specified by those rules, will waiver under *Dilliplaine* be appropriate. *Id.* at 236; *Pocono Manor*, 927 A.2d at 240.

Consistent with these principles, our Court has previously declined to find appellate waiver of issues for failure to raise them first with the Board, whenever the Board's rules of procedure did not provide a mechanism for those issues to be

presented to it so that the Board could rule on the issues in the first instance, or assurances that the Board would consider the issue if a party undertook certain steps to present claims of error to the Board. *See Station Square Gaming v. Pennsylvania Gaming Control Board*, 927 A.2d 232 (Pa. 2007); *Pocono Manor*.

In the case *sub judice*, the Board's validly promulgated and adopted rules of procedure provided a mechanism by which SugarHouse could have raised with the Board all issues relating to the alleged impropriety of the Hearing Officer's denial of its petition to intervene.[18] Specifically, the Board has adopted a regulation specifying that "[u]nless the Board hears the matter directly, all matters, except for hearings under § 441a.7 (relating to licensing hearings for slot machine licenses), will be assigned to the OHA." 58 Pa. Code § 491a.8; 58 Pa. Code § 491a.2. (defining OHA as "[a] division of the Board charged with administrating and conducting hearings *or other matters as the Board may direct*." (emphasis added)). In this case, the Board conducted no new licensing hearing in this matter on remand; rather, as indicated above, the Board prepared a Supplemental Adjudication, which was an explanatory opinion setting forth the Board's findings of fact and its rationale for portions of its November 18, 2014 order. Consequently, under 58 Pa. Code § 491a.8, SugarHouse's petition to intervene in the remand proceedings was properly referred to OHA for initial consideration.[19]

---

[18] In this respect, we construe the hearing officer's letter to SugarHouse to constitute a denial of its petition to intervene. *See* Hearing Officer Letter, 6/29/16 (Appendix B to SugarHouse Brief (J-133-2016) (Public Version)) ("Upon review of the Petition, it was determined that the relief sought ('the right to intervene and participate in the Proceedings on Remand') could not be granted because, in fact, the Board held no additional proceedings on remand as it relied upon the existing evidence of record . . . .").

[19] SugarHouse contends that its petition to intervene was a petition "to intervene in a licensing proceeding" governed by 58 Pa. Code § 441a.7(z)(2). SugarHouse Reply Brief (J-133-2016) (Public Version) at 24 n.12. However, that regulation is inapplicable since, by its plain terms, it governs only petitions to intervene in *licensing hearings*, and, as indicated, the Board did not conduct a licensing hearing in this matter on remand. (continued...)

Section 35.20 of the Administrative Code, which has not been superseded by any Board regulation, and is, thus, applicable to proceedings before the Board, delineates a specific course of action which may be taken after the adverse action of a hearing officer. *See* 1 Pa. Code § 35.20 (any action "taken by a subordinate officer under authority delegated by the agency head *may* be appealed to the agency head by filing a petition within 10 days after service of notice of the action." (emphasis added)). The Administrative Code further defines "agency head" as "[t]he secretary of a department, a quorum of an authority or departmental administrative board or commission or *independent board* or commission, or another officer or group of officers whose action with respect to a matter pending before the agency exhausts opportunity for administrative review within the agency and constitutes the action of the administrative agency for the purposes of Pa. Constitution. art. V, § 9." 1 Pa. Code § 31.3 (emphasis added). Thus, these regulatory provisions afforded a means for SugarHouse to request that the Board review the decision of its hearing officer.

However, critically, there is nothing in the Board's regulations or in the Administrative Code which provides notice to a litigant pursuing matters before the Board that it *must* follow these procedural steps and present all alleged claims of error by a hearing officer to the Board in order to preserve such claims for appeal. As discussed above, our Court indicated in *Goods* that notice of such waiver of appellate issues for failing to follow specified agency procedures governing presentation of the issue to the agency for consideration is a fundamental requirement which must be included in an agency's regulatory framework in order for waiver to be appropriate

---

(...continued)

*See* 58 Pa. Code § 441a.7(z) ("This subsection pertains exclusively to intervention in a licensing hearing for a slot machine license under this section and is not applicable to other hearings before the Board.").

under *Dilliplaine.* Thus, as the Board's regulations did not clearly inform a litigant in SugarHouse's position that failure to appeal an adverse decision of a hearing officer to the Board would result in waiver of its appellate challenges to that decision, we will not find its claims waived under these circumstances.[20]

## 2. Whether SugarHouse may intervene in this appeal.

The Board next argues that SugarHouse was properly denied the right to intervene in the proceedings on remand, and should not be permitted to intervene in this appeal, due to the fact that our Court previously upheld the Board's decision to limit SugarHouse's intervention to the question of market saturation, and because that issue was finally disposed of in *SugarHouse I.* The Board contends that the remand of a case does not start the case anew and give litigants the opportunity to relitigate issues which have been previously decided by the appellate court. Consequently, in the Board's view, because our Court affirmed the decision of the Board denying SugarHouse intervention on the issues which we remanded to the Board, SugarHouse had no right to intervene in the proceedings on remand or to appeal any portion of the Board's decision.

SugarHouse again claims that it was permitted to seek intervention under 58 Pa. Code § 441a.7(z)(2). SugarHouse does not contest that this Court in *SugarHouse I* upheld the Board's determination that it was not entitled to intervene on any issue other than market saturation; however, it contends that decision was not determinative of its right to intervene in the proceedings on remand. SugarHouse argues that the prior denial of its intervention was based on the fact that other parties and the Board's Office of Enforcement Counsel were representing its interests in proceedings before the

---

[20] We do not mean to suggest that the Board could not validly adopt such a regulation, merely that it has not done so at present.

Board. Presently, it maintains that no other party was representing its interests on remand since Market East did not participate in those proceedings, and there is no indication that the Office of Enforcement Counsel participated in those proceedings. According to SugarHouse, because it continues to have an interest in the outcome of the proceedings greater than that of the general public, due to its status as the other Category 2 license holder in the City of Philadelphia, and because there was no other party adequately representing its interests, or which would have presented the same arguments it would have made, the Board should have permitted it to intervene on remand, and, for the same reasons, it presently should be permitted to intervene in this appeal.

The question of whether a person or entity which is not a party to proceedings below may intervene in an appeal to our Court is a question of law, which we review *de novo*. *Society Hill Civic Association v. Pennsylvania Gaming Control Board*, 928 A.2d 175, 178 (Pa. 2007). First, we reject SugarHouse's argument that 58 Pa. Code § 441a.7(z)(2) governs the question of whether the Board should have permitted it to intervene on remand. As we have already discussed, the proceedings on remand were *not* a licensing hearing. *See supra* note 19. The licensing hearing in this matter was held November 18, 2014, at which the Board voted 7-0 to award the Category 2 license to Stadium. The Board conducted no new licensing hearing on remand.

Moreover, and importantly, when SugarHouse filed its *initial* petition to intervene prior to the Board's holding of suitability hearings for the various applicants, it specifically claimed that Stadium's affiliates such as Manoukian were ineligible to receive the Category 2 license under Sections 1304 and Section 1330 of the Gaming Act. The Board denied it intervention as to those claims. Because SugarHouse was not a party to the proceedings below, and because of our affirmance of the Board's

denial of its intervention, we did not consider SugarHouse's arguments to our Court concerning whether the Board's grant of a license to Stadium violated Sections 1304 and 1330. *SugarHouse I*, 136 A.3d at 470. Our ruling, therefore, finally adjudicated the question of SugarHouse's right to intervene in this case on issues involving whether Manoukian was in compliance with these statutory provisions, and, thus, established the "law of the case" with respect thereto: SugarHouse has no right of intervention with respect to these matters. *Commonwealth v. Yarris*, 731 A.2d 581, 586 (Pa. 1999) (prior legal conclusion of our Court on issue becomes law of the case).[21]

Inasmuch as the remand proceedings before the Board were restricted to requiring the Board to further explain its rationale for its prior determination that the award of the license to Stadium comported with Sections 1304 and 1330, the Board was bound by our ruling, under the law of the case doctrine, to deny SugarHouse intervention on these matters. *Riccio v. American Republic Insurance Company*, 705 A.2d 422, 425 (Pa. 1997) (pursuant to the law of the case doctrine, "a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of the same court or by a higher court in the earlier phases of the matter").[22] For

---

[21] We have not applied this doctrine inflexibly, and so we will not apply it "in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Commonwealth v. Starr*, 664 A.2d 1326, 1332 (Pa. 1995). None of these circumstances are present in the instant matter.

[22] Although our Court has articulated the law of the case doctrine in the context of a parallel relationship between trial courts, or the hierarchal relationship between appellate and trial courts, given that an administrative tribunal performs similar adjudicative functions as trial courts, and is similarly bound to follow the directives of an appellate court on remand, we consider this doctrine to be equally applicable in administrative proceedings, as is already the practice in the federal court system. *See, e.g., Wilder v. Apfel*, 153 F.3d 799 (7th Cir. 1998) ("The law of the case doctrine, which requires 'the trial court to conform any further proceeding on remand to the principles set forth in the appellate opinion unless there is a compelling reason to depart,' is (continued...)

that reason, we dismiss SugarHouse's petition for review with respect to its challenge to the Board's Supplemental Adjudication concerning Manoukian's compliance with Sections 1304 and 1330 of the Gaming Act.[23][24]

---

(…continued)
applicable to judicial review of administrative decisions. It requires the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart."(internal citations omitted)); *Grigsby v. Barnhart*, 294 F.3d 1215 (10th Cir. 2002) (same).

[23] We reject SugarHouse's argument that the denial of its renewed request for intervention somehow constitutes a denial of its due process rights. As our Court has previously emphasized, "[t]he applicability of the constitutional guarantee of procedural due process depends in the first instance on the presence of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth or Fourteenth Amendment." *Sweeney v. Tucker*, 375 A.2d 698, 712 (Pa. 1977). There is unquestionably no liberty interest at stake here in these proceedings, and, as the Board argues, SugarHouse has no legitimate property interest at stake here which would trigger the procedural protections of the due process clause. SugarHouse has been awarded a Category 2 slot machine, and these proceedings do not call into question the viability of that license. Moreover, the Gaming Act did not vest in SugarHouse an exclusive right to be the only Category 2 license holder in Philadelphia. To the contrary, the Gaming Act specifically contemplates the award of an additional Category 2 license; thus, SugarHouse has no protected interest in being the sole license holder in the City of Philadelphia.

To the extent that SugarHouse claims a right to intervene at present based on our Court's recognition that it met the first criteria to establish its right to intervene in the previous licensing proceedings under 58 Pa. Code § 441a.7(z)(2), that claim is baseless. This regulation does not confer on SugarHouse the unqualified right to intervene, but rather clearly specifies that intervention is "within the sole *discretion* of the Board." *Id.* (emphasis added). The regulation also requires that SugarHouse demonstrate that its interests would not be "adequately represented in [the] licensing hearing." *Id.* The Board found that SugarHouse's interests were adequately represented by the Board and other licensing applicants who were parties to the proceeding, and our Court affirmed the Board's decision as a valid exercise of its discretion. Merely because SugarHouse received an adverse decision by the Board and our Court on this point does not mean it was denied due process.

Likewise, there is no denial of due process in our ruling that SugarHouse was not entitled to intervention in the remand proceedings under the application of the law of the case doctrine. SugarHouse had a full and fair opportunity in the prior proceedings to present its legal arguments, and any supporting factual evidence, to the Board to demonstrate that it was entitled to intervention on questions relating to Stadium's compliance with Sections 1304 and 1330. SugarHouse also had the full and fair opportunity to appeal the Board's decision to deny it intervention, and to argue to our (continued…)

## B. Appeal of MarketEast at 125 EM 2016, J-134-2016

### 1. Board compliance with remand order.

We turn now to the issues raised by Market East. Market East first contends that the Board misinterpreted, or otherwise failed to comply with, the terms of our remand order, by issuing a Supplemental Adjudication rather than conducting a formal hearing after the matter was returned to it for further proceedings. Market East asserts that the Board's review of the existing evidentiary record and issuance of the Supplemental Adjudication did not constitute "further proceedings" within the meaning of those terms as used in our remand order. It proffers that the term "proceedings" should be strictly interpreted in accordance with one of its enumerated definitions in Black's Law Dictionary, namely as "[t]he business conducted by a court or other official body; a hearing." Market East Brief (J-134-2016) (Public Version) at 20. Thus, in its view, the Board was required by our Court's order to conduct a formal hearing and allow it to present new evidence and argument with respect to these matters.

Additionally, Market East claims that the Board also failed to comply with our Court's remand order by failing to address in its Supplemental Adjudication whether Manoukian acquired a financial interest in Stadium through specific transactions

---

(...continued)
Court that the decision was in error. Application of the law of the case doctrine under these circumstances does not deny SugarHouse due process. *See, e.g.*, 16D C.J.S. Constitutional Law § 2004 ("The application of the law-of-the-case doctrine on remand does not violate due process if a party had an ample opportunity to raise factual issues earlier in the litigation."); *Federated Mutual Insurance Company v. Anderson*, 991 P.2d 915, 927 (Mont. 1999) (same), *abrogated on other grounds by Citizens Awareness Network v. Montana Board of Environmental Review*, 227 P.3d 583 (Mont. 2010).

[24] Given that we are dismissing SugarHouse's petition for review, we do not address its arguments regarding the Board's alleged non-compliance with our remand order. With respect to SugarHouse's claim that the Board violated the Sunshine Act, we find that this claim is not yet ripe for adjudication, since, as explained *infra*, we are again remanding this case to the Board for further proceedings. Any alleged violation of the Sunshine Act by the Board's conduct of those proceedings may be raised at that time.

enumerated in that remand order, i.e., his proposed equity infusion to Sterling Investors Trust and the financial arrangements by which his family members acquired their ownership interests in Sterling Fiduciary.

The Board responds by asserting that, while our remand order was limited in scope, in that it directed the Board to consider two narrow issues on remand because the Board's disposition of them was not adequately explained in its original Adjudication, the order nevertheless granted the Board broad discretion as to what type of proceeding it was to conduct after remand. The Board acknowledges that it was obligated to follow the specific directives in the remand order, but it points out there was no language in that order which directed it to use a particular means of compliance such as conducting an evidentiary hearing, or reopening the record to take additional evidence. The Board rejects the assertion that there should be a standard definition of these terms when used in a remand order from an appellate court, since every case in which a matter is remanded to the administrative agency presents unique circumstances, and it is within the discretion of the agency to choose what particular action on its part is needed to address the issues in accordance with the terms of the appellate court's order. Here, the Board contends that "[t]here simply was no need to take further evidence to resolve the two limited issues, as neither the law nor facts related to either issue had changed since the evidentiary record closed," Board Brief (J-133-2016) at 21, and that the Board did what the order required it to do by reviewing the extant evidentiary record, and issuing its Supplemental Adjudication to further explain its decision.

We begin by observing that, although Pa.R.A.P. 2591 requires the court or other government unit on remand to "proceed in accordance with the judgment or other order of the appellate court," it does not require the court or government unit to utilize any specific mode of compliance with a general remand order, such as a trial or evidentiary

hearing. Consequently, when an appellate court remands for "further proceedings" there is no "one size fits all" talismanic definition for those terms which is applicable to all cases and situations. It is axiomatic that the facts and procedural history of each case as it developed in the lower court or administrative agency will be different when considered by an appellate tribunal, and, thus, if that tribunal determines that a remand for further proceedings is warranted, the nature of those proceedings will necessarily vary depending on the specific circumstances presented by each individual case. *See Newman Development Group of Pottstown, LLC v. Genuardi's Family Markets, Inc.*, 52 A.3d 1233, 1247 (Pa. 2012) (explaining that "remands may encompass a variety of proceedings" including remand for an opinion or explanation).

Thus, every remand order directing that further proceedings be conducted must necessarily be examined in conjunction with the opinion of the appellate tribunal and the particular facts, circumstances, and procedural history of the case in order to determine what the lower court or tribunal is required to do upon return of the case to it. It must be emphasized that, when a case is returned to a lower court or administrative agency with such a directive, those tribunals have usually already conducted some fact-finding or legal analysis in the case and, accordingly, this acquired familiarity with the already developed record allows the court or administrative agency considerable discretion to choose the specific type of proceedings it will conduct in order to fulfill the purposes for which the appellate court has ordered remand.

As recited above, when this matter was last before our Court, we considered a variety of legal challenges to the Board's November 18, 2014 order awarding the Category 2 slot machine license to Stadium. The Board's explanation of its reasons for entering that order, set forth in its Adjudication issued that same day, was sufficient for us to conduct appellate review of all but two of the appellate issues we were asked to

decide: whether the award of the license violated Sections 1304(a)(1) or 1330 of the Gaming Act.

Because we agreed with Market East's contention in that appeal that the Board's Adjudication did not sufficiently articulate its rationale for determining that Stadium's post-licensure structure complied with these statutory sections, we remanded to the Board for it to conduct "further proceedings" with regard to these two questions so that we could engage in proper appellate review of its prior legal conclusion that the award of the license did not violate these statutory provisions. We left it to the Board's discretion as the finder and trier of fact to determine whether it could sufficiently explain its rationale for finding Stadium's post-licensure ownership structure compliant with Sections 1304(a)(1) and 1330 based on the extant record before it, or whether it needed to take additional evidence to complete its task. While the Board was certainly free under our remand order to conduct additional hearings and receive supplementary evidentiary submissions if it considered that course of action necessary to comply with our directive, there was nothing in our order which compelled it to do so. Therefore, we deem the particular proceedings which the Board undertook in response to our order — the preparation of a Supplemental Adjudication in which it explains, based on the evidentiary record already before it and matters of public record, the reasons supporting its prior determination that Stadium complied with these statutory provisions, and, correspondingly, why its order awarding Stadium the Category 2 license was supported — to be a suitable mode of compliance.

We also reject Market East's contention that the Board was required under our remand order to receive additional factual evidence or argument at a formal hearing in order to articulate its definition of the term "financial interest," as used in Section 1330. We directed the Board to explain how it interpreted the Gaming Act and its own

regulations to define this term, which is a purely legal exercise reviewable *de novo* by this Court.[25] Accordingly, we reject Market East's contention that the Board failed to follow our remand order.

## 2. The Board's definition of "financial interest" under Section 1330.

Next, Market East contends that the Board erred by adopting an excessively restrictive definition of the term "financial interest" which is at odds with the commonly understood definition of that term. We first recount the Board's explanation in its Supplemental Adjudication of how it defines this term. The Board notes that this term is not defined in Section 1330; however, it acknowledges that there are two other places in the Gaming Act where the term is defined: (1) Section 1201, which establishes the membership, composition, and terms of the Board members, and places restrictions on the Board and its staff, defines "financial interest" as "[a]n ownership, property, leasehold or other beneficial interest in an entity," 4 Pa.C.S. § 1201; and (2) Section 1512, which restricts the financial interests of "an executive-level public employee, public official or party officer, or an immediate family member thereof," describes these terms as "[o]wning or holding, or being deemed to hold, debt or equity securities or other ownership interest or profits interest," *Id.* § 1512. The Board considered these definitions to be restricted to the statutory sections in which they appear and not to apply to the definition of financial interest used in Section 1330.

In formulating its definition of financial interest applicable to Section 1330, the Board recounted that it first examined the language of the sentence in which it was used, i.e., "may possess an ownership or financial interest that is greater than 33.3%."

---

[25] Although we conclude that the Board complied with the directives in our remand order, that does not mean, as discussed below, that we agree with its ultimate legal conclusion regarding the definition of financial interest under Section 1330 and its use of that definition in its analysis of the questions we asked it to resolve.

*Id.* § 1330. The Board found that, because this sentence uses the disjunctive "or" to distinguish financial interest from ownership interest, this signifies the intent of the legislature to have financial interest be distinguishable in meaning from direct ownership. The Board next viewed the use of the "greater than 33.3%" language to convey the legislature's intent that a financial interest be restricted in meaning "to things that are quantifiable, on a percentage basis, up to 100% 'of a slot machine licensee.'" Supplemental Adjudication, 6/23/16, at 18. The Board noted that it has previously and consistently interpreted "financial interest" to include both "indirect ownership" of a casino through other entities and a "profits interest," as both are quantifiable up to 100%. Supplemental Adjudication, 6/23/16, at 19.

Consistent with what it perceives to be the General Assembly's intent to have some diversification of ownership and control of casinos, but not to preclude large lenders who finance the construction of such casinos, and owners of the real estate on which casinos are situated, from financing multiple casino construction projects, the Board rejected the more traditional and expansive definition of these terms to mean "an interest equated with money or its equivalent," which includes things such as "loan agreements, leases and security instruments." *Id.* at 19, n.18 (quoting Black's Law Dictionary, [631] [(6th Ed.)]). The Board considers such interests not to be easily quantifiable, and, thus does not consider them to be financial interests, "absent some unique factual circumstances." *Id.*

Although the Board explained what it did not consider to be a financial interest, the Board never articulated a definition *for* this term in the Supplemental Adjudication. Even so, the Board proceeded to a putative analysis of Manoukian's financial interests in Stadium. The Board first reminded that it had already determined that Manoukian had no indirect ownership interest in Stadium in excess of the statutory limit imposed by

Section 1330. *See SugarHouse I*, 136 A.3d at 481. The Board then proceeded to analyze how the profits from Stadium's operations would be divided under the terms of the various operating agreements between the entities which comprised its ownership structure. The Board determined that, "[i]dentical to ownership interests, all profits generated from the operation of Stadium will be split equally between the entities [Stadium Casino Investors] SCI and [Stadium Casino Baltimore Investors] SCBI." Supplemental Adjudication, 6/23/16, at 9.

The Board found that the profit division between the Sterling Investors Trust and SCI also paralleled the Sterling Investors Trust's ownership interest in SCI. Thus, as the Sterling Investors Trust owns 34% of SCI, under the Board's calculation, it would receive 34% of its profits. Because SCI, in turn, owns 50% of Stadium, the Sterling Investors Trust, by the Board's calculation, ultimately receives 17% of Stadium's profits.[26] The remaining percentage of Stadium's profits flow to Greenwood through its ownership interest in SCI. Because Greenwood owns 66% of SCI, which in turn owns 50% of Stadium, Greenwood receives 33% of Stadium's profits.[27]

The Board determined, without explanation, that not all of the profits which Greenwood receives from Stadium will be retained by Manoukian.[28] Nevertheless, the Board reasoned that, even if it attributed all of Greenwood's 33% profit interest in Stadium to Manoukian, there is no violation of Section 1330 because, by its estimation,

_____

[26] This computation is derived by multiplying these fractional profit interests together, $(.34)(.50)$, to give Sterling Investors Trust an aggregate 17% $(.17)$ profit interest in Stadium.

[27] This computation was arrived at by the Board in the following fashion: $(.66)(.50) = (.33)$.

[28] The Board determined in its first Adjudication that Manoukian owned 85.84% of Greenwood. Adjudication, 11/18/14, at 80. Assuming, as the Board does, that Manoukian's profit interest follows his ownership interest, Manoukian's actual profit interest in Stadium through Greenwood would seemingly be only 28%: $(.8584)(.66)(.50) = .28)$

Manoukian will receive none of the profits realized by the Sterling Investors Trust. The Board found that, once Manoukian established the irrevocable trust, he relinquished all control over its assets, inasmuch as the complete control of those assets rested with the corporate trustee, Sterling Fiduciary, and Manoukian retained only a 28% minority interest in that corporation such that he did not control its appointment of officers, directors, and employees, nor could he control decisions regarding trust management. Additionally, the beneficiaries of the trust were Manoukian's children, and their spouses, Supplemental Adjudication, 6/23/16, at 10, and, as set forth above, Manoukian is not entitled under the terms of the trust document to receive any proceeds or distributions from the trust.

Market East argues that the Board erred in not utilizing the definition of financial interest contained in Sections 1201 and 1512, or the Board's regulation governing the financial interests of its members which describes financial interest as "[a]n ownership, property, leasehold or other beneficial interest in an entity." 58 Pa. Code § 403a.1. Market East proffers that, even though these definitions are broad, they are in accord with the common usage of these terms as reflected by the Black's Law Dictionary definition the Board recited in the Supplemental Adjudication. Further, in Market East's view, the more expansive definitions chosen by the General Assembly for financial interest in Sections 1201 and 1512 are evidence of its intent that the term financial interest be construed throughout the Gaming Act in accordance with the generally accepted meaning of these terms.

Market East assails the Board's reliance on the quantifiability of an interest as determinative, as, in its view, this disregards any financial interest that is not simple to calculate. Market East points out that the definition which the Board adopted included indirect ownership, even though the use of the disjunctive "or" in Section 1330 — i.e.,

ownership or financial interest — indicated that the legislature did not intend to subsume any ownership interest within the definition of financial interest. Market East contends that, in any event, other financial interests such as loans are quantifiable up to 100%, yet the Board offers no reason why those interests are not included in its definition.

Market East rejects the Board's conclusion that including loans within the definition of financial interest would encompass commercial lenders or holders of real estate on which casinos will be built, since Section 1330, by its terms, applies only to a "slot machine licensee, its affiliate, intermediary, subsidiary or holding company," which typical commercial lenders and holders of casino property would not be. To the contrary, according to Market East, Section 1330's restrictions were intended to encompass someone who already possesses a casino license from acquiring a financial interest in another casino greater than 33.3% so as to guard against monopolization and to promote competition. Market East contends that the Board's definition undermines this legislative objective.

Market East avers that the term financial interest must be given its plain meaning in analyzing Manoukian's planned financial contributions to Sterling Investors Trust. Market East asserts that the proposed equity infusion by Manoukian to the Sterling Investors Trust would establish his financial interest in that entity and, in turn, his financial interest in Stadium. This interest, it argues, when coupled with his financial interest in Stadium through Greenwood, would put Manoukian over the 33.3% limit permitted by Section 1330.

The Board responds by defending its derivation of its definition of financial interest under Section 1330 set forth in its Supplemental Adjudication, and it largely reiterates in its brief its reasoning set forth in that adjudication for choosing this particular definition. It notes, further, though, that our Court recognized in *SugarHouse*

*I*, consistent with prior rulings from our Court, that it, as the administrative agency tasked with interpreting and applying this statute, is best suited to furnish a definition of these terms.

Additionally, in support of its interpretation, the Board cites to a regulation it promulgated in 2007 to address the multiple slot machine license prohibitions of Section 1330 — 58 Pa. Code § 441a.17 — though it did not discuss this regulation in its Supplemental Adjudication. Specifically, the Board notes that paragraph (j) of this regulation states that "[n]othing in this section concerning ownership or financial interests applies to contractual interests including those in the nature of management contracts, options to purchase exercisable after a license has been issued or leases." 58 Pa. Code § 441a.17(j). The Board argues that a promissory note, which is a contract in support of a loan, would fall within this exclusion. The Board, however, admits that, at present, the precise nature of the equity infusion Manoukian will make to Sterling Fiduciary is undetermined. *See* Board Brief at 26 ("The one open issue which remains regarding the Sterling Investors Trust is how Manoukian will finance it, by gift or loan."). The Board contends that it is therefore "premature to say Stadium is precluded by Section 1330 from receiving a license." *Id.* at 28.[29]

Since the parties' contentions focus on the meaning of the term "financial interest" as used in Section 1330 of the Gaming Act, we are guided in our review by the principles of the Statutory Construction Act, 1 Pa.C.S. §§ 1501 *et seq.* ("SCA"). The paramount objective of our interpretative task under the SCA is to "ascertain and effectuate the intention of the General Assembly" in enacting the legislation under review. *Id.* § 1921(a). The polestar indication of the legislature's intent is the plain

---

[29] Stadium, in its brief filed as Intervenor, aligns itself with the Board on these arguments.

language of the statute. *Department of Environmental Protection v. Cumberland Coal*, 102 A.3d 962, 975 (Pa. 2014). Accordingly, when interpreting statutory language, all "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." 1 Pa.C.S. § 1903(a). The SCA mandates that, if the words of a statute are clear and unambiguous, their plain meaning should not be disregarded by a reviewing court "under the pretext of pursuing its spirit." *Id.* § 1921(b).

In addition to these principles, the SCA also furnishes certain presumptions of which a reviewing court is entitled to avail itself in order to ascertain the intent of our legislature, two of which are relevant in this instance: (1) "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," and (2) "the General Assembly intends the entire statute to be effective and certain." *Id.* § 1922(1), (2). Further, since we are considering an administrative agency's interpretation of its governing statute, its interpretation will "be given controlling weight unless clearly erroneous." *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 998 A.2d 589, 594 (Pa. 2010). Thus, although we accord an administrative agency such as the Board substantial deference in construing the laws it is tasked with administering, "we need not defer uncritically, particularly if we find that the interpretation is imprudent or inconsistent with legislative intent." *500 James Hance Court v. Pennsylvania Prevailing Wage Board*, 33 A.3d 555, 573 (Pa. 2011).

Applying these foundational principles to the interpretation of the term "financial interest," we first note that the Board is correct that the legislature did not define this term as it did in Sections 1201 and 1512 of the Gaming Act. As the parties have discussed, those sections define financial interest in terms of an ownership, beneficial, or profits interest in another entity. *See* 4 Pa.C.S. § 1201 (defining "financial interest" as "[a]n ownership, property, leasehold or other beneficial interest in an entity"); *Id.* § 1512

(defining "financial interest" as "[o]wning or holding, or being deemed to hold, debt or equity securities or other ownership interest or profits interest."). Thus, the legislature's choice not to use these definitions for financial interest in Section 1330 suggests an intent to give this term a different meaning in this statutory section.[30] *See Fletcher v. Pennsylvania Property and Casualty Insurance Guarantee Association*, 985 A.2d 678, 684 (Pa. 2009) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent."). However, merely because the legislature did not incorporate the definitions from Sections 1201 and 1512 into Section 1330, it does not necessarily follow, as the Board has concluded, that the legislature intended to have this term construed in a circumscribed manner so as to exclude from the definition its ordinary meaning.[31] To the contrary, as detailed above, a proper interpretation of this term, which on its face is unambiguous, must necessarily consider its common and approved usage in the English language, which may be determined from its dictionary definition. *In re Beyer*, 115 A.3d 835, 839 (Pa. 2015).

Conventional dictionaries do not define the term "financial interest." Nevertheless, Webster's defines "financial" as "pertaining or relating to money matters;

---

[30] Accordingly, we disagree with Justice Baer that we should import the definition of "financial interest" from either Section 1201 or 1512. Indeed, as the discussion in his concurrence makes plain, the definitions in those two sections, while similar, address different contexts, and contain distinct exclusions. *See* Concurring Opinion (Baer, J.) at 3-7. The legislature could have, but did not, include either of these definitions (or their related exclusions) in Section 1330.

[31] For this reason, we disapprove of the Board's incorporation of an indirect ownership interest into its definition of "financial interest," as an indirect ownership interest is encompassed within the term "ownership interest." Although we do not disagree that the term "financial interest" might naturally be defined as also including an ownership interest, as the concurrence also offers, *see* Concurring Opinion (Baer, J.) at 6-7, the legislature, through the use of the terms "ownership or financial interest" in the disjunctive context evidences, in our view, its intent for these terms to have separate meanings.

pecuniary." *Webster's Unabridged Dictionary of the English Language* 719 (2d. ed. 1998); "Pecuniary" is also understood to mean "[o]f or relating to money." *American Heritage Dictionary* 622 (4th ed. 2001). Further, "interest" is pertinently defined as "[a] right, claim or legal share in something." *Id.* at 445. Thus, a financial interest would be any monetary right, claim, or legal share. This is consistent with the Black's Law Dictionary definition referenced by the parties. *See* Black's Law Dictionary 1846 (10[th] ed. 2014) (defining "financial interest" as "[a]n interest involving money or its equivalent; esp., an interest in the nature of an investment — Also termed *pecuniary interest*" (emphasis original)). Consequently, applying these ordinary and commonly understood meanings to the term "financial interest" as used in Section 1330, we construe Section 1330 to prohibit a slot machine licensee, or its affiliate, from possessing a legally enforceable monetary right or claim against another slot machine licensee, or an investment in another slot machine licensee, which exceeds 33.3% of the value of that slot machine licensee's financial assets. This definition is therefore broad enough to encompass loans from one slot machine licensee to another since, in that situation, the licensee which is the lender acquires a monetary right or claim to repayment of the loan proceeds from the recipient licensee in accordance with the loan's terms. *See also* 4 Pa.C.S. § 1311 (defining financial interest of "agents, employees or persons" in slot machine license applicant to include "*debt* or equity securities" (emphasis added)).

This definition is consonant with the legislature's stated objective in the Gaming Act that it "be implemented in such a manner as to prevent possible monopolization by establishing reasonable restrictions on the control of multiple licensed gaming facilities in this Commonwealth." *Id.* § 1102(5). A licensee which is a significant lender or investor in multiple other licensees may conceivably acquire a proportional degree of influence over those licensees, undermining their ability to effectively compete, and

fostering monopolistic forces which the legislature sought to avoid through Section 1330's strict caps on the proportional ownership and financial interest one licensee may possess in another licensee. We, therefore, cannot countenance the Board's narrow interpretation of financial interest to exclude these type of monetary arrangements.

We recognize, of course, that our interpretation is contrary to the Board's interpretation of the regulation which it promulgated to provide guidance as to the meaning of the term "financial interest," 58 Pa. Code § 441a.17(j), since the Board views that regulation as excluding contracts associated with a loan such as promissory notes. Respectfully, we must conclude that the Board's interpretation of this regulation is clearly erroneous, and, thus, we are not required to defer to it. This regulation provides: "Nothing in this section concerning ownership or other financial interests applies to contractual interests including those in the nature of management contracts, options to purchase exercisable after a license has been issued or leases." *Id.* By including promissory notes, which are contracts, within the scope of this regulation, despite its lack of explicit reference to such instruments, the Board has interpreted this regulation in a manner which could conceivably exclude from the definition of "financial interest" a wide variety of contracts entered into by a licensee, not just the limited type of specialized service, property rental, or purchase contracts enumerated in the regulation. Such an interpretation would absurdly exclude *any* contract establishing a monetary obligation of one slot machine licensee to another from the ambit of Section 1330. Thus, for instance, any operating agreements between licensees that assign gaming revenue from one licensee to another would be regarded as not creating a financial interest in the assignee, even if the contract required the obligor licensee to pay the assignee 100% of its revenues.

For all of these reasons, we must reverse the Board's determination of what constitutes a financial interest as that term is used in Section 1330 of the Gaming Act. Moreover, inasmuch as the Board, by its own admission, has not identified exactly what type of equity infusion Manoukian will be making to the Sterling Investors Trust, i.e., a loan or gift, nor has the Board identified the nature of the financial transaction by which he transferred his ownership interest in Sterling Fiduciary to his family members, we must again remand to the Board for it to conclusively determine these matters and to correspondingly determine whether either of these transactions will result in Manoukian having a financial interest, as we have defined those terms in this opinion, in Stadium post-licensing which is in violation of Section 1330.[32]

### 3. Manoukian's eligibility to apply for a Category 1 slot machine license during Stadium's application process.

Finally, we address Market East's argument that the Board erred in its determination that Manoukian was not eligible to apply for another additional Category 1 slot machine license in addition to the license he possessed as an affiliate of Parx Casino. The Board found that, in order for an individual to be eligible to apply for a Category 1 license, Section 1302 of the Gaming Act requires that the applicant have been previously issued a horse or harness racing license, and conducted horse or harness racing for at least two years at the location where the applicant wants to operate a Category 1 licensed facility. The Board noted that, in 2013, in the midst of Stadium's application process, there was one remaining Category 1 license available, and an entity known as Valley View, which held a harness racing license for a racetrack it was seeking to build in Lawrence County, filed an application for that Category 1

---

[32] Inasmuch as these matters are not of record, it would appear that the Board, on remand, must re-open the evidentiary record and develop evidence to answer these questions.

license. Valley View sold its interest in the racetrack project to Endeka Entertainment ("Endeka") in 2013, and Endeka received the harness racing license previously awarded to Valley View. The Board found, based on its previously conducted background investigation of Stadium and Manoukian, that neither they, nor any of their affiliates, were owners or financiers of, or otherwise involved with, Endeka or Valley View. The Board also examined the lists of slot machine and racetrack applicants published in the Pennsylvania Bulletin and determined that neither Stadium, nor Manoukian, received a new horse or harness racing license during the entirety of the time Stadium's application was pending, nor had either applied for such a license. Because neither Manoukian, nor Stadium, possessed a horse or harness racing license, the Board reasoned that neither was eligible to apply for a Category 1 license during this time period.

Market East argues that the Board is incorrect in its conclusion, because Manoukian was already a Category 1 license holder through Greenwood, and, thus, this fact indicated that it was presumptively eligible to apply for such a license again. Market East also contends that the Board's conclusion rested on the fact that Endeka had already applied for the last remaining Category 1 license, and, thus, no licenses were available. Nevertheless, Market East avers that the availability of a Category 1 license is irrelevant to an applicant's eligibility to apply for such a license.

The Board responds that the requirements of Section 1302 are clear — a person or entity must already possess a horse or harness racing license in order to apply for a Category 1 license — and the record indicates that, at the time Stadium applied for its Category 2 license, neither Manoukian, nor any other entity or person affiliated with Stadium, sought or was issued a new horse or harness racing license. The Board notes that Manoukian's current horse racing license is, as are all such licenses, location-

specific for Greenwood's Parx Casino facility and may not be transferred to a new location, and thus, neither Manoukian, nor any other of Greenwood's affiliates, may use it to apply for a new Category 1 license.

Consistent with the intent of the legislature in structuring the Gaming Act to prevent control of multiple gaming facilities by one individual or entity, Section 1304(a)(1) of the Gaming Act excludes from eligibility to apply for a Category 2 license any individual or entity which is also "eligible to apply for a Category 1 license." 4 Pa.C.S. § 1304(a)(1). The eligibility requirements for an individual or entity to apply for a Category 1 license are set forth in Section 1302 of the Gaming Act, which provides:

> **(a) Eligibility.--**A person may be eligible to apply for a Category 1 license to place and operate slot machines at a licensed racetrack facility if the person:
>
>> (1) has been issued a license from either the State Horse Racing Commission or the State Harness Racing Commission to conduct thoroughbred or harness race meetings respectively with pari-mutuel wagering and has conducted live horse races for not less than two years immediately preceding the effective date of this part;
>>
>> (2) has been approved or issued a license from either the State Horse Racing Commission or the State Harness Racing Commission to conduct thoroughbred or harness race meetings respectively with pari-mutuel wagering within 18 months immediately preceding the effective date of this part and will successfully conduct live racing pursuant to the requirements of section 1303 (relating to additional Category 1 slot machine license requirements);
>>
>> (3) has been approved by the State Harness Racing Commission, after the effective date of this part, to conduct harness race meetings with pari-mutuel wagering and will conduct live

racing pursuant to the requirements of section 1303; or

(4) is a successor in interest to persons eligible under paragraph (1), (2) or (3) who comply with the requirements of section 1328 (relating to change in ownership or control of slot machine licensee) or is a successor in interest to persons otherwise eligible under paragraph (1), (2) or (3) but precluded from eligibility under the provisions of section 1330.

Nothing in this part shall be construed to permit the approval or issuance of more than one slot machine license at a licensed racetrack facility.

**(b) Location.--**A Category 1 license may only be issued to an eligible person authorizing slot machine operations at the particular licensed racetrack facility identified in the application. No Category 1 licensed facility shall be located within 20 linear miles of another Category 1 licensed facility.

*Id.* § 1302. (footnotes omitted).

We agree with the Board that, under the plain language of these statutory provisions, only an individual or entity which has been approved for, or issued a license by, the State Racing Commission or the State Harness Racing Commission for a particular location is eligible to apply for a Category 1 slot machine license. Having an approved or issued horse or harness racing license, is, thus, a necessary predicate condition for an individual to be eligible to apply for a Category 1 license. As the record supports the Board's determination that neither Manoukian, nor Stadium, nor any of their affiliates had been, during the time Stadium's Category 2 license application was pending, either approved for or issued a horse or harness racing license for a location

other than the location covered by the Parx Casino license,[33] we must affirm the Board's finding that they were ineligible to apply for a Category 1 license under Section 1302.[34]

## III. Conclusion

We grant the Board's motion to dismiss SugarHouse's petition for review at 124 EM 2016, as it was not entitled to intervene in the proceedings on remand.[35] In Market East's petition for review, at 125 EM 2016, we affirm the Board's adjudication to the extent that it determined that Manoukian was not eligible to apply for a Category 1 slot machine license at the time of Stadium's application for its Category 2 license. However, we reverse the Board's determination of what constitutes a financial interest as that term is used in Section 1330, and we remand to the Board for further proceedings consistent with this opinion. Specifically, the Board is to determine whether, after Stadium's licensure, Watche Manoukian will possess a financial interest in Stadium in excess of the 33.3% permitted by Section 1330, either through his planned equity infusion to Sterling Investors Trust, or via the transaction by which he conveyed his ownership interest in Sterling Fiduciary Services to his family members.

---

[33] Although the mere fact that Manoukian affiliate Greenwood already possessed a harness racing license and Category 1 license for its Parx Casino facility did not automatically disqualify Manoukian from holding a Category 1 license for another location, conversely, this possession of a Category 1 license for the Parx Casino did not, in and of itself, make Manoukian automatically eligible to apply for another category 1 license for a different location. As the Board notes, harness racing licenses which have already been granted are restricted to the specific location for which they were issued. *See* 3 Pa.C.S. § 9314.

[34] In making its determination of whether Manoukian or any of Stadium's affiliates had been approved for, or been issued, a horse or harness racing license, the Board was entitled to take judicial notice of the proceedings of other administrative agencies as published in the Pennsylvania Bulletin. *See* 45 Pa.C.S. § 506 (specifying that the contents of the Pennsylvania Code and Pennsylvania Bulletin "shall be judicially noticed").

[35] Sugarhouse's Motions for Leave to File Under Seal the Confidential and Unredacted Versions of its Principal Brief, Reply Brief, and Reproduced Record are hereby granted.

The Board is directed to conduct all appropriate proceedings in order to receive evidence sufficient for it to make this determination, including but not limited to, reopening the evidentiary record and holding a public hearing. The Board is also directed to follow its normal procedures and issue an appropriate final order after it has made these determinations.

Jurisdiction relinquished.

Chief Justice Saylor and Justices Donohue, Dougherty, Wecht and Mundy join the opinion.

Chief Justice Saylor files a concurring opinion.

Justice Baer files a concurring opinion.