**DEPARTMENT OF ENVIRONMENTAL PROTECTION,** Petitioner

v.

**DELAWARE RIVERKEEPER NETWORK, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 12, 2015.
Decided April 10, 2015.

Dennis A. Whitaker, Chief Counsel, Harrisburg, for petitioner.

Aaron J. Stemplewicz and Corinne M. Bell, Bristol, for respondent.

BEFORE: DAN PELLEGRINI, President Judge, and ANNE E. COVEY, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge ANNE E. COVEY.

The Department of Environmental Protection (DEP) petitions this Court for review of the Pennsylvania Office of Open Record's (OOR) July 11, 2014 Final Determination granting the Delaware Riverkeeper Network's (DRN) appeal from

DEP's denial of DRN's Right–to–Know Law (RTKL)[1] request for sample data underlying DEP's Technologically–Enhanced Naturally–Occurring Radioactive Material (TENORM) Study. The issues for this Court's review are whether the sample data is exempt from disclosure as: (1) records of a noncriminal investigation under Section 708(b)(17) of the RTKL, 65 P.S. § 67.708(b)(17), and/or (2) internal, predecisional deliberations under Section 708(b)(10)(i)(A) of the RTKL, 65 P.S. § 67.708(b)(10)(i)(A). Upon review, we reverse.

"In 2013, [DEP's] Bureau of Radiation Protection (Bureau) began a comprehensive[, ongoing TENORM S]tudy evaluating potential radiation exposure to workers, the public, and the environment resulting from certain materials generated by oil and gas exploration and production (oil and gas production) activities in Pennsylvania." DEP Br. at 7; *see also* Reproduced Record (R.R.) at 38a–39a. On April 10, 2014, DRN made the following RTKL request (Request) to DEP:

> The following records dated from 2013 to present relating to [DEP]'s TENORM [S]tudy are requested:
>
> All sample data including data acquired at specialized Marcellus Shale treatment operations and on-site water treatment and recycling units, the exact location of

all sample sites (including the address, GPS coordinates, and facility name if applicable), information regarding the type of beneficial use sites that have been and will be sampled, and the production data and dates for the well pads that have been and will be sampled. The study's expected completion date is also requested along with information regarding the peer review process including information regarding the selection and composition of the peer review panel and any opportunities for public input. Additionally, the 1994 [Naturally-occurring radioactive material (NORM)] Study 'Characterization and Disposal Options for Oil Field Waste in Pennsylvania' is requested.

R.R. at 21a. By April 10, 2014 letter, DEP acknowledged the Request and invoked a 30–day extension to respond.[2] *See* R.R. at 22a–23a. On May 14, 2014, DEP granted the Request in part and denied it in part. DEP granted the Request "with respect to 294 pages of material describing the TENORM [S]tudy and the status of the [S]tudy, as well as the requested 1994 study." R.R. at 24a. DEP notified DRN that additional TENORM study information was available at *http://www.portal.state.pa.us/portal/server.pt/community/oil_gas_related_topics/20349/radiation protection/986697*.[3] *See* R.R. at 25a.

---

1. Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

2. Section 902(b)(2) of the RTKL, 65 P.S. § 67.902(b)(2), affords agencies up to 30 days to respond to RTKL requests.

3. A report regarding the TENORM Study (Report) was posted on DEP's website in January 2015. Section 1.1 of the Report (Purpose and Objectives of the Study) provides, in pertinent part:

> In 2013, DEP initiated a study to collect information and data needed to effectively manage TENORM from [oil and gas (O &

G)] operations for environmental and health protection. This study included the assessment of potential worker and public radiation exposure, evaluation of potential impacts from TENORM waste disposal, and the investigation of possible radiological environmental effects. **The survey and sample data will be used to address potential radiological concerns from O & G operations, disposal of waste, and product use.** This study report **includes recommendations for future actions to be taken to address issues of concern identified by the study, including additional investigations and surveys.**

DEP denied the Request regarding the underlying sample data as exempt from disclosure under Section 708(b) of the RTKL, *inter alia,* because the data constitutes noncriminal investigative records and internal predecisional deliberations. *See* R.R. at 25a–26a. DEP added that "[f]ield work performed as part of this study during 2013 included 184 site visits at 114 locations and the analysis of 1,000 samples. Given the scope and nature of this the sample data collected to date is voluminous." R.R. at 25a.

 DRN appealed to OOR on June 2, 2014, arguing that the exemptions do not apply because the records are purely factual, were not deliberative and merely reflect information-gathering for study purposes rather than for conducting a noncriminal investigation. *See* R.R. at 16a. OOR invited the parties to supplement the record. DEP filed a response on June 19, 2014, to which was attached the Attestation of Bureau Director/Certified Health Physicist David Allard (Allard) and an Exception and Privilege Log (Log) reflecting that DEP took 3,495 samples/surveys resulting in 57,308 pages of records. *See* R.R. at 37a–43a. DRN replied on July 2, 2014. On July 11, 2014, without holding a hearing, OOR issued its Final Determination granting DRN's appeal and ordering DEP to provide the responsive records within 30 days. DEP appealed to this Court.[4]

 "The RTKL was designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials and make public officials accountable for their actions." *Office of the Governor v. Raffle,* 65 A.3d 1105, 1107 n. 1 (Pa.Cmwlth.2013). Accordingly, Section 301(a) of the RTKL requires that "[a] Commonwealth agency shall provide public records in accordance with [the RTKL]." 65 P.S. § 67.301(a).

 "Whether [the] sought after information constitutes a 'public record' is a preliminary, threshold issue that must be decided before reaching the question of whether any exceptions under Section 708 of the RTKL apply." *Office of the Governor v. Bari,* 20 A.3d 634, 640 (Pa.Cmwlth. 2011). "Public record" is defined as "[a] record, including a financial record, of a Commonwealth ... agency that: (1) is not exempt under [S]ection 708 [of the RTKL]; (2) is not exempt from being disclosed under any other [f]ederal or [s]tate law or regulation or judicial order or decree; or (3) is not protected by a privilege." 65 P.S. § 67.102. In order for the requested information to be a "public record," it "must constitute a 'record' under the RTKL[.]" *Bari,* 20 A.3d at 640.

Section 102 of the RTKL defines "[r]ecord" as "[i]nformation, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transac-

(Emphasis added).

4. "This Court's standard of review of a final determination of the OOR is *de novo* and our scope of review is plenary." *Hunsicker v. Pennsylvania State Police,* 93 A.3d 911, 913 n. 7 (Pa.Cmwlth.2014).

Attached to DEP's brief is Allard's Amended Attestation, which contains more detail regarding the TENORM Study process. *See* DEP Br.App. A.

[T]he RTKL does not prohibit this Court from considering evidence that was not presented to the OOR. Indeed, in reviewing a decision of the OOR, this Court is entitled to the broadest scope of review, while mindful to proceed in a manner most consistent with justice, fairness and expeditious resolution.

*Pennsylvania Hous. Fin. Agency v. Ali,* 43 A.3d 532, 534 n. 7 (Pa.Cmwlth.2012) (citation omitted).

tion, business or activity of the agency." 65 P.S. § 67.102. There is no dispute in this case that the sampling data DRN requested from DEP was created, received and/or retained in connection with DEP's TENORM Study activity and, therefore, constitutes records. Whether they are public records depends upon whether they are exempt under Section 708(b) of the RTKL.

■ "The burden of proving that a record of a Commonwealth agency ... is exempt from public access shall be on the Commonwealth agency ... receiving a request by a preponderance of the evidence." 65 P.S. § 67.708(a)(1). "Although the general provisions of the [RTKL] must be liberally construed to effect its objects, the exemptions from disclosure under Section 708(b) [of the RTKL] must be narrowly construed." *Hous. Auth. of the City of Pittsburgh v. Van Osdol*, 40 A.3d 209, 215 (Pa.Cmwlth.2012).

■ DEP argues that OOR erred by ordering DEP to provide sample data gathered for its TENORM Study because it is exempt from disclosure as records of a noncriminal investigation under Section 708(b)(17) of the RTKL.

■ Section 708(b)(17) of the RTKL **exempts from public access:**

A record of an agency relating to a noncriminal investigation, including:

. . . .

(ii) **Investigative materials,** notes, correspondence and reports.

. . . .

(vi) **A record that, if disclosed, would** do any of the following:

(A) **Reveal the institution, progress or result of an agency investigation,** except the imposition of a fine or civil penalty, the suspension, modification or revocation of a license, permit, registration, certification or similar authorization issued by an agency or an executed settlement agreement unless the agreement is determined to be confidential by a court.

65 P.S. § 67.708(b)(17) (emphasis added). This Court has held that "as used in Section 708(b)(17) [of the RTKL], the **term 'investigation' means a systematic or searching inquiry, a detailed examination, or an official probe.**" *Sherry v. Radnor Twp. Sch. Dist.*, 20 A.3d 515, 523 (Pa.Cmwlth.2011) (emphasis added) (quoting *Dep't of Health v. Office of Open Records*, 4 A.3d 803, 810–11 (Pa.Cmwlth. 2010)). Moreover, "in order for an agency to conduct any type of investigation, the investigation would necessarily be **a part of the agency's official duties.**" *Sherry*, 20 A.3d at 523 (quoting *Dep't of Health*, 4 A.3d at 814) (emphasis added).[5]

DEP contends that the sample data underlying the TENORM Study is official because it falls under DEP's authority un-

---

5. This Court observed:

While the OOR places significance on the fact that the noncriminal investigation exemption under the RTKL no longer refers to investigations conducted as part of an agency's official duties, like the investigation exception under the Prior [RTK] Law did, we do not believe that the General Assembly's actions in leaving this language out of the RTKL is particularly meaningful. Agencies are creatures of statute and, thus, only have the authority to act pursuant to their official duties as established by their enabling legislation. As such, in order for an agency to conduct any type of investigation, the investigation would necessarily be a part of the agency's official duties. Therefore, the General Assembly likely deemed it unnecessary to retain language referring to an agency's official duties in the noncriminal investigation exemption. *Dep't of Health*, 4 A.3d at 814 (citation omitted).

der Section 301(c) of the Radiation Protection Act,[6] which states:

> [DEP] shall have the power and its duties shall be to:
>
> . . . .
>
> **(2) Develop and conduct comprehensive programs** for the registration, licensing, control, management, regulation and inspection of radiation sources and radiation source users.
>
> . . . .
>
> **(5) Carry out a comprehensive program of monitoring levels of radioactivity** in Pennsylvania's environment, including all appropriate tests for alpha, beta and gamma levels in all appropriate media. . . .
>
> . . . .
>
> (12) Encourage, participate in or **conduct studies, investigations,** training, research, remedial actions and demonstrations **relating to control, regulation and monitoring of radiation sources.**
>
> . . . .
>
> (20) **Prepare a report on environmental radiation levels, as determined by the monitoring program, on at least an annual basis.** Copies of the report shall be submitted to the President pro tempore of the Senate and the Speaker of the House of Representatives of the General Assembly and shall be made available to the general public. The report shall also contain a description and analysis of any emergency responses or other actions taken by [DEP] under this act and any other information about environmental radiation or radiation emergencies which [DEP] deems to be of sufficient importance to call to the atten-

tion of the General Assembly and the citizens of the Commonwealth.

35 P.S. § 7110.301(c) (emphasis added). Further, DEP maintains that the TE-NORM Study was a systematic and searching inquiry or detailed examination because it involved extensive scientific testing, data collection and analysis for the purpose of determining whether future DEP action, such as new or amended legislation, regulations, policies or technical guidance, is necessary to protect human health and the environment.

OOR's position is that the RTKL does not expressly exempt studies from public disclosure, and that the Radiation Protection Act makes a distinction between "studies" and "investigations." In its Determination, OOR distinguished that "[a]n investigation is an inquiry that may or may not result in a sanction pursuant to the agency's authority of regulating the activity. A study is an academic or scientific analysis of a matter unrelated to the licensing or regulation of a specific activity." OOR Final Det. at 8. OOR concluded that DEP did not prove by a preponderance of the evidence that what DEP specifically named a "study" was an "investigation" exempt from disclosure under Section 708(b)(17) of the RTKL.

Whether records fall under the noncriminal investigation exemption is not a new question. The RTKL's predecessor (Prior Law)[7] also protected noncriminal investigations from public access. Under both versions of the RTKL, the courts have grappled with what constitutes a noncriminal investigation. In *Department of Health,* this Court analyzed judicial interpretations of the Prior Law in this context and found that "the courts did not focus on

---

**6.** Act of July 10, 1984, P.L. 688, *as amended,* 35 P.S. § 7110.301(c).

**7.** Act of June 21, 1957, P.L. 390, *as amended, formerly* 65 P.S. §§ 66.1–66.9, repealed by Section 3102(2)(ii) of the RTKL, 65 P.S. § 67.3102(2)(ii).

whether the investigation was initiated by a complaint or some other triggering event; rather, **the courts focused on the nature of the particular documents involved and whether they were created during the course of an investigation."** *Id.* at 813 (emphasis added).

Under the Prior Law, raw data compiled during agency information-gathering was held not to be a public record subject to disclosure, since it is unanalyzed and may or may not ultimately influence the agency's decision or future action. *See Safety, Agric., Villages & Env't, Inc. v. Delaware Valley Reg'l Planning Comm'n,* 819 A.2d 1235 (Pa.Cmwlth.2003) (documents relating to the effect on the environment and agriculture of a proposed highway improvement project were not public records); *Aronson v. Dep't of Labor & Indus.,* 693 A.2d 262 (Pa.Cmwlth.1997) (prevailing wage survey results compiled by the Department of Labor and Industry to satisfy the Secretary's requirement to set the prevailing wage were not public records); *Aamodt v. Dep't of Health,* 94 Pa.Cmwlth. 54, 502 A.2d 776 (1986) (raw data produced during a study of the effects of the Three Mile Island accident on area pregnancies was not a public record).

Under the RTKL, this Court has held that detailed materials generated during nursing home inspections conducted by the Department of Health (DOH) in accordance with its official, governmentally-mandated duties constituted noncriminal investigative records exempt from disclosure under Section 708(b)(17) of the RTKL. *Dep't of Health.* On the other hand, this Court held that Section 708(b)(17) of the RTKL did not exempt a report by the Department of Public Welfare (DPW) regarding a one-time performance audit of the National Comprehensive Center for Fathers (NCCF). *Dep't of Pub. Welfare v. Chawaga,* 91 A.3d 257 (Pa.Cmwlth.2014). The *Chawaga* Court reasoned:

Because the inspections [by DOH in *Department of Health* ] involved 'visiting and inspecting the building, grounds, equipment and supplies of a nursing home; reviewing records of the nursing home and patients; and observing and interviewing patients and staff of the nursing home,' this court found that the inspections amounted to a systematic inquiry, and, thus, an investigation. *Id.* This court also stated that 'strong public policy considerations support interpreting [S]ection 708(b)(17) of the RTKL as being applicable to the particular [i]nspections and [s]urveys conducted by the [DOH] in th[at] case.' *Id.* Thus, we determined that the noncriminal investigation exemption applied. *Id.* at 811–14.

Here, DPW's performance audit report was not part of a 'systematic or searching inquiry' or a 'detailed examination.' Unlike the comprehensive, repeated, on-site inspections of nursing homes conducted in *Department of Health,* DPW did not make regular and repeated visits to NCCF locations. Rather, DPW conducted a one-time inquiry into NCCF's finances by interviewing management; reviewing the general ledger, payroll records, invoices, and client case files; inventorying the manufacturing equipment; and examining various other supporting documents. . . .

Further, the performance audit report is not an 'official probe.' An official probe only applies to 'noncriminal investigations conducted by an agency acting within its legislatively granted fact-finding and investigative powers.' *Johnson v. Pennsylvania Convention C[tr.] Auth[.],* 49 A.3d 920, 925 (Pa.Cmwlth. 2012). Here, DPW's performance audit was not part of the DPW's legislatively[-]granted fact-finding or investigative

powers; rather, the audit was ancillary to DPW's public assistance services. A contrary interpretation of an 'official probe' would craft a gaping exemption, under which any governmental information-gathering could be shielded from disclosure.

Additionally, the public policy considerations favoring exemption in *Department of Health* do not exist here. On the contrary, maintaining the transparency of such a performance audit report serves the public interest by discouraging financial abuses by businesses under governmental contracts. The 'Generally Accepted Government Auditing Standards' (GAGAS) promulgated by the United States Comptroller General evidence this public policy consideration.

*Id.* at 259.

In *Pennsylvania Public Utility Commission v. Gilbert*, 40 A.3d 755 (Pa. Cmwlth.2012), the Public Utility Commission (PUC) denied a RTKL request for violation and pipeline incident reports and communications from pipeline owners/operators regarding public awareness programs obtained by PUC gas safety inspectors *during compliance evaluations.* On appeal, OOR deemed the records public. This Court reversed, reasoning, in pertinent part:

Here, the investigations performed by the PUC are done as part of the requirement for eligibility for funding from the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA).[FN6] In order to qualify for funding, PHMSA requires an annual certification by the PUC. To facilitate the certification process, the PUC created its Bureau of Investigation & Enforcement (I & E) and hired gas safety inspectors whose sole duty is to conduct inspections/investigations of gas utilities

for compliance with applicable state and federal gas safety regulations. . . . The gas safety inspectors' inspections/investigations involve the investigation of the gas utility's entire operation, the plant, the infrastructure, the records and employees. . . . The purpose of these inspections/investigations is to assess whether the gas utility is providing the quality of service mandated by law. . . . The gas safety inspections involve systematic, searching, detailed examinations of a natural gas utility's operations and whether such operations were in compliance with the applicable federal and state pipeline safety regulations.

FN6. The Pipeline Safety Act was created through Chapter 601 of Title 49 of the United States Code, 49 U.S.C. §§ 60101–60137. The purpose of the Act is to 'provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation.' 49 U.S.C. § 60102(a)(1). 'The Secretary shall prescribe minimum safety standards for pipeline transportation and for pipeline facilities' and 'ensure that employees who operate and maintain the facility are qualified to operate and maintain the pipeline facilities.' 49 U.S.C. § 60102(a)(2) & (3). The Secretary of Transportation created PHMSA, which is responsible for '[a]dministering a national program of safety in natural gas ... pipeline transportation including identifying pipeline safety concerns, developing uniform safety standards, and promulgating and enforcing safety regulations.' 49 C.F.R. § 1.4(h)(1). The federal government may authorize a state to act as its agent to inspect interstate pipelines, but retains responsibility for enforcement of the regulations. 49 U.S.C. § 60117(c). The Pipeline Safety Act authorizes federal grants to aid states with the cost of the personnel, equipment, and activities reasonably required to undertake pipeline regulatory, inspection, and enforcement responsibilities. 49 U.S.C. § 60107.

. . . .

As in *Department of Health*, the I & E is conducting the inspections/investiga-

tions to determine if the utilities are in compliance with the Public Utility Code, 66 Pa.C.S. §§ 101–3316, the PHMSA and other applicable state and federal regulations. The Public Utility Code, 66 Pa.C.S. § 335(d) (emphasis added), provides in pertinent part:

> In addition to any other requirements imposed by law, including ... the [Law] ..., whenever the [PUC] conducts an investigation of an act or practice of a public utility and *makes a decision, enters into a settlement with a public utility or takes any other official action* ... with respect to its investigation, it shall make part of the public record and release publicly any documents relied upon by the [PUC] in reaching its determination....

It is not until after the PUC's investigative materials are presented as part of a formal complaint, presented at a formal hearing, or presented as part of a settlement agreement that the materials are made public.

....

.... Allowing access to these investigative materials that may contain unsubstantiated statements or allegations about an owner, employee or utility, would be problematic, because the owner, employee or utility would not be provided the opportunity to respond to the materials. *See Dep[']t of Health,* 4 A.3d at 812 (documents will not be disclosed that contain unsubstantiated statements or allegations about a nursing home or individual because the nursing home or individual would not have an opportunity to respond).

Further, strong public policy considerations support interpreting [S]ection 708(b)(17) [of the RTKL] as being applicable to these particular inspections/investigations conducted by the PUC's I & E gas safety inspectors. Requiring the PUC to disclose the gas safety inspec-

tors' notes, employee statements, and other materials related to the inspections/investigations could lead to owners and employees being less likely to cooperate and provide relevant information out of fear of retaliation or public embarrassment. If individuals are less likely to cooperate in the inspections/investigations process, then the inspections/investigations will no longer be an effective means of monitoring the utilities compliance with statutory and regulatory requirements. *See Dep[']t of Health,* 4 A.3d at 811–12 (strong public policy considerations support interpreting [S]ection 708(b)(17) [of the RTKL] as being applicable to the [DOH]'s inspections and surveys).

....

Additionally, the enumerated exceptions set forth in [S]ection 708(b)(17)(vi) [of the RTKL] that are subject to public disclosure, i.e., records that impose fines/penalties, modify prior authorizations, or are settlement agreements, do not apply to the requested records. The requested records are generated by the PUC's I & E gas safety inspectors during inspections and ensuing determinations on whether to prosecute. The gas safety inspectors are without authority to assess fines/penalties, modify a prior authorization, or execute a settlement agreement to resolve formal complaints or prosecutions for violations of federal and state natural gas safety regulations. Any formal action or determination by the PUC to impose civil fines/penalties or to enter into settlements of formal complaints/ prosecutions of gas safety activities can only be undertaken by the PUC after a majority vote at an open public meeting and effective upon entry of a PUC order.

*Id.* at 759–62 (footnotes omitted).

Despite DRN's representation that "protection of witnesses is not a concern in the

instant case because the information gathered through [DEP's] TENORM Study is purely factual and is gathered from inanimate objects via radiological and other instruments," and that specific compliance by any particular oil and gas developer does not appear to have compelled the TENORM Study, we find this Court's precedent instructive. DRN Br. at 25.

Allard, the individual responsible for "direct[ing] the Bureau's implementation of a statewide radiation protection program" confirmed that "DEP has the power and duty through the Radiation Protection Act to conduct studies and investigations relating to the control, regulation and monitoring of radiation sources." DEP Br.App. A (Allard's Amended Attestation) at 1, 6. He explained:

4. [NORM] is in subsurface layers of rock in various geologic formations in Pennsylvania. When drilling into these formations for oil and gas wells, the material brought to the surface (*i.e.*, drill cuttings) can contain NORM. Likewise, water used during the hydraulic fracturing process that flows back to the surface during unconventional gas production (*i.e.*, flowback water) and brine generated during conventional oil and gas production may also contain NORM.
5. Drill cuttings, flowback water, and brine from oil and gas production activities are managed and treated in various ways resulting in [TENORM]. The disposal of TENORM is regulated by DEP.

Allard's Amended Attestation at 1–2 ¶¶ 4–5.

Allard specifically attested that in order to insure the accuracy of the TENORM Study's results, the Bureau must review the preliminary and unvalidated raw data that DRN requested to ensure its accuracy. *See* Allard's Amended Attestation at 2, 5, 8. He articulated that "data produced by the gamma counting system and other radiochemistry laboratory counting system software requires human review and analysis to ensure that there are not erroneous assumptions made by the software that could have an alternative scientific explanation." Allard's Amended Attestation at 10. Allard described:

21. The Bureau is engaged in deliberations regarding the [quality assurance/quality control (QA/QC)] process necessary to ensure the accuracy and validity of the radiation data for the TENORM samples. Those deliberations include review of the techniques employed to collect samples and conduct field surveys, review of procedures followed in performing analytical test methods, and review of radiation analytical results generated to verify the validity of media-specific algorithms in analytical instrument software.
. . . .
35. . . . . Once that valid data is captured, it is used ⋯ to further calculate potential radiation exposure to the workers and public, and interpret that potential exposure against acceptable national and state radiation protection standards.
. . . .
37. When the Bureau completes its probing inquiry and subsequent internal deliberations and determines the potential human health and environmental effects of [naturally occurring radioactive material (NORM)] and/or TENORM generated during O & G exploration and production, the Bureau will provide its final findings and determinations, as well as the validated data, in a detailed report that will be available to the public. The report, which is expected to be issued by the end of the year, is [DEP's] final decisional record.
38. The [S]tudy's recommendations are driven by the data collected. The data is the subject of DEP's deliberations, or

reflects its deliberations, of future agency action or recommendations that will be contained in DEP's final report. The data and deliberations cannot be severed without disclosing deliberations of DEP.

39. Depending on TENORM's impact to human health or the environment, the [S]tudy will determine future DEP action regarding its handling. Future DEP action may include recommendations of any or all of the following: new or amended legislation, new or amended regulations, new or amended technical guidance, or new or amended DEP policies.

40. The premature release of DEP's TENORM unvalidated and preliminary data to the public prior to the Bureau's completion of its internal deliberations, with respect to the quality of data and the potential effects to human health and the environment, will result in erroneous and/or misleading characterization of the levels and effects of NORM and/or TENORM associated with O & G exploration and production currently under investigation because such data does not reflect the final decision of DEP.

Allard's Amended Attestation at 8, 12–13 ¶¶ 21, 35, 37–40.

It is clear based upon the record evidence that because DEP collected the sampling data at issue in compliance with the Radiation Protection Act's mandate that DEP monitor, control and regulate radiation sources on an ongoing basis, it was the result of "a systematic or searching inquiry, a detailed examination, or an official probe" in the course of DEP's official duties and, thus, constitutes a noncriminal investigation. *Sherry.* Narrowly construing application of Section 708(b)(17)

of the RTKL to the requested sampling data, as we must, we hold that DEP met its burden of proving by a preponderance of the evidence that the data is exempt from disclosure and, therefore, is not a public record. Accordingly, OOR erred by ordering DEP to disclose the sample data underlying TENORM Study to DRN.[8]

Based on the foregoing, OOR's Final Determination is reversed.

## ORDER

AND NOW, this 10th day of April, 2015, the Pennsylvania Office of Open Record's July 11, 2014 Final Determination is reversed.

---

8. Having determined that the sample data is exempt from disclosure as records of a noncriminal investigation under Section 708(b)(17) of the RTKL, we need not address whether it is also exempt as internal, predecisional deliberations under Section 708(b)(10)(i)(A) of the RTKL.