# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Department of Labor and    :
Industry,                                      :
                     Petitioner     :
                                       :
               v.              :    No. 1583 C.D. 2019
                                       :    Submitted: May 11, 2020
Chester Darlington,                  :
                    Respondent    :

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                       HONORABLE CHRISTINE FIZZANO CANNON, Judge
                       HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE COHN JUBELIRER                      FILED: June 9, 2020

       The Pennsylvania Department of Labor and Industry (Department) petitions for review of the October 16, 2019 Final Determination of the Office of Open Records (OOR), which granted in part and denied in part Chester Darlington's (Requester) appeal of the Department's denial of his Request under the Right-to-Know Law (RTKL).[1] The OOR ordered the Department to provide copies of regular boiler inspection reports,[2] but documentation relating to the Department's investigation of a 2016 incident would remain exempt from disclosure pursuant to Section 708(b)(17) of the RTKL, 65 P.S. § 67.708(b)(17), which relates to

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

[2] The parties describe the field inspections with various terms throughout their briefs including: periodic, routine, and regular inspections.

noncriminal investigations.[3] On appeal, the Department only argues that the OOR erred in ordering the periodic boiler inspection reports to be produced, asserting they are exempt from disclosure as they constitute noncriminal investigations conducted pursuant to the Department's authority under the Boiler and Unfired Pressure Vessel Law[4] (Boiler Law). Requester responds that the inspections mandated by the Boiler Law do not constitute noncriminal investigations, and therefore, the OOR did not err in its Final Determination. Upon review, we affirm.

## I.    BACKGROUND

On August 28, 2019, Requester submitted a Request to the Department's Agency Open Records Officer (AORO), seeking "any and all records and relevant materials . . . including but not limited to correspondence, inspections, investigation reports, citations, violations, penalties, photographs, etc. pertaining to an incident which occurred on June 15, 2016 at Veolia Energy Plant Philadelphia . . . ." (Reproduced Record (R.R.) at 10a.) The Department "denied [the] [R]equest

---

[3] Section 708(b)(17) states, in relevant part, that "[a] record of an agency relating to a noncriminal investigation, including . . . [i]nvestigative materials, notes, correspondence and reports" are exempt from disclosure. 65 P.S. § 67.708(b)(17). In addition, the RTKL exempts from disclosure:

> (vi) A record that, if disclosed, would . . .
>
> > (A) Reveal the institution, progress or result of an agency investigation, except the imposition of a fine or civil penalty, the suspension, modification or revocation of a license, permit, registration, certification or similar authorization issued by an agency or an executed settlement agreement unless the agreement is determined to be confidential by a court.

65 P.S. § 67.708(b)(17)(vi)(A).

[4] Act of June 18, 1998, P.L. 655, 35 P.S. §§ 1331.1-1331.18.

2

because records of the Department relating to a noncriminal investigation . . . and records that would reveal the institution, progress or result of a Department investigation are exempt from disclosure under the RTKL." (*Id*. at 11a.) Furthermore, the Department noted that those records did not fall within the exception to the noncriminal investigation exemption, specifically that the records did not include any indication of an "imposition of a fine or civil penalty; the suspension, modification, or revocation of a license, permit, registration, certification, or similar authorization; or an executed settlement agreement." (*Id*.)

On September 9, 2019, Requester appealed to the OOR and stated that the Department's "blanket denial [was] improper. Redactions should [have] be[en] made and the remainder produced. . . . In addition, the response is vague and non-specific by using the words 'among others' and an incomplete citation to the regulation." (*Id*. at 9a.) The Department filed a position statement, wherein it claimed that "[b]ecause the weight of the evidence establishes that the requested records are exempt from disclosure, the Department's denial should be affirmed." (*Id*. at 20a.) The Department specifically explained that it investigated an incident that occurred in June 2016 at Veolia Energy Plant Philadelphia for alleged violations of the Boiler Law, pursuant to the Department's powers under Section 4 of the Boiler Law, 35 P.S. § 1331.4. "Therefore, the Department's investigation was conducted pursuant to the Department's legislatively granted fact-finding powers." (R.R. at 20a.) The Department also submitted an attestation by Matthew W. Kegg, Director of the Department's Bureau of Occupational and Industrial Safety (BOIS). (*Id*.) Mr. Kegg stated that BOIS conducted a thorough examination of the records and determined the records fell under the "statutory

3

mandate" of the Boiler Law and that none of the records fell into an exception to the noncriminal investigation exemption. (*Id*. at 20a-21a, 23a.)

On September 26, 2019, the OOR emailed the parties requesting that the Department provide a supplemental attestation with additional descriptions and details as to the records.[5]  On October 1, 2019, the Department submitted the supplemental attestation of Mr. Kegg in response to the OOR's request.  (*Id*. at 33a.)  Mr. Kegg stated that some of the inspections were "regular inspections performed on a periodic basis.  Others, however, [were] the direct result of a boiler and/or other regulated pressure vessel incident or a complaint."  (*Id*. at 35a.)  Additionally, Mr. Kegg noted that the inspection reports of the boiler date back to 1991.  (*Id*. at 35a-36a.)  According to Mr. Kegg,

> [t]hese electric inspection reports provide information regarding the equipment inspected; whether it passed or failed inspection; specific location in the plant; manufacturer; and a description of any deficiencies found by the inspector.  Because these inspection reports contain information relating to whether or not deficiencies were uncovered by inspectors in the course of legally[]mandated safety inspections of the equipment, they constitute records that would reveal the institution, progress or result of an agency investigation.

(*Id*. at 36a.)  Mr. Kegg also stated that investigations and periodic inspections include specific reviews of the equipment and interviews with maintenance staff and other employees who have knowledge of the equipment's operation.  (*Id*.)

---

[5] Requester responded the same day to provide "context" for the Request.  (R.R. at 27a.)  In the reply e-mail, Requester stated that he represented Flowserve, Inc. and "Veolia Energy, the location of the subject incident[,] [was] asserting that [his] client's product caused the incident.  Thus, [he] was seeking information about the incident and how it may have occurred."  (*Id*.)  The OOR then asked Requester for an extension to issue a Final Determination so that any additional evidence provided could be considered, which Requester allowed.  (*Id*. at 30a.)

4

On October 16, 2019, the OOR issued its Final Determination, which granted in part and denied in part Requester's appeal. The OOR noted that there were 22 inspection reports that the Department identified as responsive records. (Final Determination at 4.) In reviewing the original and supplemental attestations provided by Mr. Kegg, the OOR stated that the attestations do "not establish that the inspections at issue rise to the level of a noncriminal investigation." (*Id.* at 6.) In reaching this conclusion, the OOR set forth the standard for noncriminal investigations, as established by this Court in *Department of Health v. Office of Open Records*, 4 A.3d 803 (Pa. Cmwlth. 2010). Specifically, the OOR explained that, to constitute a noncriminal investigation, "an agency must demonstrate that 'a systemic or searching inquiry, a detailed examination, or an official probe' was conducted regarding a noncriminal matter," which was "'conducted as part of an agency's official duties.'" (Final Determination at 4-5 (quoting *Dep't of Health*, 4 A.3d at 810-11, 814).) Furthermore, the OOR explained that "the investigation must specifically involve an agency's legislatively granted fact-finding powers." (*Id.* at 5.)

The OOR then examined the Boiler Law, which according to the OOR, requires annual field inspections to be performed by an inspector either employed by the owner of the boiler, an insurer, a contractor, or a Department inspector. The OOR noted that reports from those inspections must be filed within 15 days and, in the event of an accident, the Department must be immediately notified. The OOR found the Boiler Law authorizes the Department to investigate violations and punish violators. (*Id.*) With that background, the OOR turned to the regular inspections at issue. The OOR considered the attestations submitted by Mr. Kegg and determined the Department did not meet its burden of showing the regular

5

boiler inspections rise to a level of noncriminal investigation. The OOR determined that this matter was distinguishable from *Department of Health*. Although both cases involved physical inspections, the OOR found the regular inspections here do not raise "the same concerns about witness confidentiality or harm to reputation" as was present in *Department of Health*, which also involved review of nursing home and patient records and interviews of patients and staff, disclosure of which raised public policy concerns. (*Id*. at 6-7.)

In addition, the OOR noted that the boiler inspections at issue were performed regularly every 12 months regardless of the inspection's findings, and that the owner of a boiler may decide to have the inspection done by a private, certified inspector. "[A]bsent evidence that any given [regular] boiler inspection report touched off a more detailed inquiry by the Department," the OOR stated it could not "conclude that such reports rise to the level of a noncriminal investigation within the meaning of the RTKL." (*Id*. at 7.) The OOR concluded that the Department was, therefore, required to provide copies of the regular boiler field inspection reports to Requester. However, the OOR distinguished the records related to the 2016 incident, which it found were related to a noncriminal investigation of the Department. Requester did not appeal this aspect of the OOR's Final Determination and, therefore, only the regular boiler field inspection reports are at issue in this appeal.

The Department filed a Petition for Review of the OOR's Final Determination wherein it asserted that

> [t]he OOR erred when it found that routine boiler inspections do not rise to the level of noncriminal investigations because every boiler safety inspection is conducted as part of the Department's official duties, specifically involves the Department's legislatively granted

6

fact-finding powers, and constitutes a "systematic or searching inquiry, a detailed examination, or an official probe."

(Petition ¶ 18 (quoting *Dep't of Health*, 4 A.3d at 811).) The Department asserted that even if the Court would consider a boiler safety inspection not to be a noncriminal investigation, the Request, on its face, sought information related to an incident, which warranted a noncriminal investigation, and those investigations are exempt under Section 708(b)(17) of the RTKL.

## II.   PARTIES' ARGUMENTS

On appeal,[6] the Department argues that the OOR erred by concluding that the regular inspection records did not relate to a noncriminal investigation. The Department asserts that the Boiler Law grants the Department authority to conduct a boiler safety inspection to determine compliance with the Boiler Law, whether or not the inspections are linked to a reported incident. Further, the Department argues that there does not need to be an incident or "triggering event" for an investigation to be considered a noncriminal investigation. (Department's Brief (Br.) at 14.) The Department asserts that the OOR precedent does not support the OOR's determination that drew a distinction between regular inspections and investigations into alleged incidents. Furthermore, the Department argues that the case law supports an interpretation that the Department's regular safety inspections qualify as noncriminal investigations under the RTKL. The Department cites to

---

[6] Our scope of review of the RTKL is plenary. *Pa. Pub. Util. Comm'n v. Gilbert*, 40 A.3d 755, 758 n.5 (Pa. Cmwlth. 2012). Our standard of review in open records cases is an independent review of the OOR's order and we may substitute the OOR's findings of fact for our own. *Id.* "A court reviewing an appeal from an OOR hearing officer is entitled to the broadest scope of review, a review of the entire record on appeal along with other material, such as a stipulation of the parties, or an in camera review of the documents at issue, and we may further supplement the record through hearing or remand." *Id.*

7

*Pennsylvania Public Utility Commission v. Gilbert*, 40 A.3d 755 (Pa. Cmwlth. 2012), *Department of Environmental Protection v. Delaware Riverkeeper Network*, 113 A.3d 869 (Pa. Cmwlth. 2015), and *Michak v. Department of Public Welfare*, 56 A.3d 925 (Pa. Cmwlth. 2012), arguing that these cases demonstrate that the word used in classifying the actions of the government agency is not important and instead it is whether the agency has conducted "a systematic or searching inquiry, a detailed examination, or an official probe" as established in *Department of Health*.

Additionally, the Department argues that the Request specifically asked for all records pertaining to the 2016 incident. The Department asserts that because the OOR ordered the release of regular investigations "unrelated to the Department's investigation," "such documents fall outside the scope of Requester's [R]equest." (Department's Br. at 19.) Thus, any documents related to regular inspections, the Department asserts, fall outside the Request.

Requester argues that the OOR's Final Determination was correct. Requester asserts that there is a clear difference in the Boiler Law regarding "inspection" and "investigation" activities, which are specifically delineated and separated within the Boiler Law's sections, noting that Section 9, 35 P.S. § 1331.9, provides for inspections, and Sections 14 and 15, 35 P.S. §§ 1331.14-1331.15, provide for investigations. (Requester's Br. at 8.) Requester asserts that the Department ignores these distinctions to erroneously conclude that inspections fall under the RTKL's noncriminal investigation exemption. Requester further argues that the cases cited by the Department do not apply in the case before us because, under the Boiler Law, inspections and investigations are not "identical conduct and should not be treated as being the same under the RTKL." (*Id.* at 14.) Also, Requester argues that *Department of Health* is distinguishable from the instant

8

case, specifically citing the special concern over the privacy of health records in nursing home inspections and the differences between health care laws and the Boiler Law. Requester notes that in *Department of Health*, the evaluation at issue was long and detailed, consisting of interviews and records with privileged medical information. Requester asserts that the lack of privacy is proven by the Boiler Law permitting third parties to conduct the mandated inspection in lieu of the Department inspecting a boiler. Regarding the scope of the Request, Requester argues that his Request was broad and requested the inspection records relating to the incident. Requester further asserts that the OOR determined that the records were responsive to the Request. Requester notes that the Department did not object to this determination and thus has waived this issue.

In its reply brief, the Department argues that *Department of Health* applies because interviews about noncompliance with the Boiler Law also warrant protection to promote truthful answers without "fear of retaliation or embarrassment" and without condemnation from unsubstantiated statements or allegations if released to the public. (Department's Reply Br. at 5-6.) Furthermore, the Department argues that an "expectation of privacy" "is not relevant to an analysis of whether the documents [Requester] requested are subject to disclosure under the RTKL." (*Id*. at 6.) In addition, the Department asserts that the Boiler Law does not allow the owner of the boiler to decide who performs the inspections, and instead that authority still lies with the Department as the inspections must be performed by "the Department or by a Department-Commissioned inspector." (*Id*. at 7.) Finally, the Department asserts that regardless of who is performing the inspection, the Department is still the decision-maker on "whether the boiler's certificate of inspection should be renewed,

suspended or revoked . . . , whether a notice of deficiencies should be issued, . . . or whether a boiler should be sealed because it is unsafe." (*Id*.)

## III. DISCUSSION

A Commonwealth agency's records are presumed public, unless they fall within an exemption under the RTKL. An agency is permitted to withhold "[a] record of an agency relating to a noncriminal investigation," which includes "investigative materials, notes, correspondence[,] and reports," and records that would "[r]eveal the institution, progress or result of an agency investigation, except the imposition of a fine or civil penalty, the suspension, modification or revocation of a license, permit, registration, certification or similar authorization issued by an agency" or "[c]onstitute an unwarranted invasion of privacy." 65 P.S. § 67.708(b)(17)(i), (ii), (vi)(A), and (vi)(C). However, neither the term "noncriminal" nor "investigation" are defined in the RTKL. Therefore, this Court has previously analyzed their ordinary usage and interpreted "noncriminal" to mean "the exemption of investigations other than those that are criminal in nature." *Gilbert*, 40 A.3d at 759 (citing *Dep't of Health*, 4 A.3d at 810). The Court has interpreted an "investigation" as "a systematic or searching inquiry, a detailed examination, or an official probe." *Dep't of Health*, 4 A.3d at 811. The burden is on the Department to prove, by a preponderance of the evidence[7] that an exemption applies. *See* 65 P.S. § 67.708(a)(1).

---

[7] "The preponderance of the evidence standard, which is 'the lowest evidentiary standard, is tantamount to a more likely than not inquiry.'" *Smith on behalf of Smith Butz, LLC v. Pa. Dep't of Envtl. Prot.*, 161 A.3d 1049, 1059 n.10 (Pa. Cmwlth. 2017) (citation omitted).

10

We begin with a brief review of the Boiler Law, which the Department contends provides the basis for its claim that the regular inspections constitute noncriminal investigations under the RTKL. The Department is empowered by the Boiler Law to enforce the Boiler Law, as well as promulgate and enforce related regulations. Section 13(a) of the Boiler Law, 35 P.S. § 1331.13(a). The Boiler Law mandates that a boiler or unfired pressure vessel installed in Pennsylvania must adhere to the Boiler Law and related regulations promulgated by the Department. Section 3 of the Boiler Law, 35 P.S. § 1331.3. A boiler or unfired pressure vessel must follow the design, construction, and installation requirements adopted by the Department to ensure safety. 35 P.S. § 1331.4. Additionally, owners must register their boiler or unfired pressure vessel with the Department and operation is not allowed until a preliminary inspection is completed. Section 6 of the Boiler Law, 35 P.S. § 1331.6.

Once operational, boilers are also subject to required regular field inspections, and the reports of the inspections must be given to the Department. Section 9(f) of the Boiler Law, 35 P.S. § 1331.9(f).[8] The **owner may arrange for the inspection, either** by requesting an insurance company's inspector, an inspector employed by the owner of the boiler, or a commissioned private

[8] Section 9(f) of the Boiler Law states:

Each inspector shall forward to the department a report of each field inspection made of any boiler or unfired pressure vessel showing the exact condition of the boiler or unfired pressure vessel. Inspection reports shall be submitted within 15 days of the date of inspection. Inspection reports received more than 15 days after the inspection was made may be considered invalid by the [D]epartment. The report shall be filed on the form and in the manner prescribed by the [D]epartment.

35 P.S. § 1331.9(f).

inspector hired by the owner of the boiler to complete the inspection. 35 P.S. § 1331.9(a)-(c). However, if the owner does not assure that a field inspection has been arranged, a Department inspector shall perform the inspection, and the owner "shall be responsible to pay the [D]epartment a fee for the inspection." 35 P.S. § 1331.9(d). Should the owner "fail[] to assure a field inspection is performed[,] . . . the owner shall be subject to appropriate enforcement action as provided under this act." 35 P.S. § 1331.9(e). According to the Department's regulations, an inspector must be "an individual holding a current Pennsylvania Inspector Commission [in order] to inspect boilers and unfired pressure vessels in this Commonwealth." 34 Pa. Code § 3a.111. Should an inspector find that the "boiler is dangerous to life or property, the inspector shall immediately notify the [D]epartment of all deficiencies." Section 10(f) of the Boiler Law, 35 P.S. § 1331.10(f). The Department then determines whether the boiler is fit for operation. *Id*. If the inspector finds that the boiler is in compliance with the codes and safe for operation, the Department shall issue a certificate of operation. Section 11 of the Boiler Law, 35 P.S. § 1331.11.

Should an "accident or explosion" occur, the "owner, user or operator shall immediately notify the Department." 34 Pa. Code § 3a.93(a). Until a "Department inspection" occurs, the boiler, its parts, and equipment "may not be removed or disturbed." 34 Pa. Code § 3a.93(b). In addition, under Section 14 of the Boiler Law, the Department has the power to **investigate any violations** and may enter any building or structure housing boilers for the purpose of enforcing the Boiler Law. 35 P.S. § 1331.14.

In the case before us, the OOR determined that investigations into violations and regular inspections were two distinct activities under the Boiler Law, and the

regular inspections did not fall within the noncriminal investigation exemption of the RTKL. The OOR explained that regular boiler inspections are done on a regular basis, "regardless of the findings of the inspection." (Final Determination at 7 (citing 35 P.S. § 1331.10).) The OOR also noted that owners of boilers could satisfy the regular inspection requirements without any action by the Department. (*Id*.) The OOR cited to *Department of Health* and decided that regular boiler inspections did not raise the same concerns of "witness confidentiality or harm to reputation" that were at issue in that case. (Final Determination at 6-7.) In *Department of Health*, 4 A.3d at 806-07, the requester sought records from the Department of Health (DOH) regarding surveys and inspections completed pursuant to the Health Care Facilities Act[9] (HCFA). The issue before this Court was whether those inspections and surveys mandated by the HCFA fell under the noncriminal investigation exemption of Section 708(b)(17) of the RTKL. *Id*. at 809.

In analyzing whether the "inspections" under the HCFA qualified as "investigations" under the RTKL, this Court pointed to the long list of requirements for inspections to determine whether the nursing homes were in compliance with the HCFA and other federal and state laws and regulations, including: interviews with staff; reviewing records of patients and the nursing home; inspection of the nursing home itself; and overall observation of operations. *Id*. at 811. The Court concluded that this thorough review constituted "a systematic or searching inquiry, a detailed examination, or an official probe" and thus was an "investigation" into whether the nursing home was in compliance with

---

[9] Act of July 19, 1979, P.L. 130, *as amended*, added by Section 7 of the Act of July 12, 1980, P.L. 655, 35 P.S. §§ 448.807–448.808, 448.813.

13

state and federal laws and regulations. *Id*. at 811-12. Additionally, the Court noted the strong public policy concerns "support interpreting Section 708(b)(17) as being applicable to the particular [i]nspections and [s]urveys conducted by the Department." *Id*. at 811. If those HCFA inspections became public, the Court reasoned, the release of interviews could cause a chilling effect on residents and staff of nursing homes to provide information in the future for fear of retaliation or embarrassment. *Id*. Thus, the Court noted, those inspections and surveys would be less accurate and "no longer be an effective means of monitoring a nursing home's compliance." *Id*. The Court also stated that there were serious concerns over confidentiality of patient information and records. *Id*. at 811-12.

Following *Department of Health*, this Court has examined other forms of inspections and determined they were exempt from disclosure. In *Michak*, a request was made for relevant License Inspection Summaries (LISs) performed by the Department of Public Welfare, Office of Child Development and Early Learning. A LIS describes "deficiencies in a licensee's compliance with the relevant statute and regulations, and provides space for the licensee to set out a plan of correction." 56 A.3d at 928-29. The requester in *Michak* argued that the LISs were not exempt because they "modif[ied] or condition[ed] day care providers' certificates of compliance," (*id*. at 928), and that the LIS information was already published on the Department of Public Welfare's website, (*id*. at 929), but did not argue that inspections were not covered under the noncriminal investigation exemption. This Court determined that the OOR properly determined that LISs fell within the noncriminal investigative exemption.

In *Gilbert*, we also reviewed inspections, specifically gas utility safety inspections, completed for certification. We concluded those inspections "involve

14

systematic, searching, detailed examinations of a natural gas utility's operations and whether such operations were in compliance with the applicable federal and state pipeline safety regulations." 40 A.3d at 760. The OOR determined that the Public Utility Commission (PUC) did not establish that the requested records under those inspections fell under the noncriminal investigation exemption. *Id*. at 758. We determined that the request asked for investigative materials, and statements made by the utility's employees, and thus created the same concerns regarding disclosure as arose before this Court in *Department of Health*. *Id*. at 761. Accordingly, we concluded that the inspections qualified as noncriminal investigations and thus were exempt from public disclosure. *Id*. at 762.

As guided by our decision in *Department of Health*, we must determine whether a regular inspection under the Boiler Law qualifies as a noncriminal investigation that is exempt from public disclosure by determining whether "the Department is making a systematic and searching inquiry, a detailed examination, or an official probe" into operations and compliance with controlling laws and regulations. *Dep't of Health*, 4 A.3d at 811. That the statute or regulation refers to an "inspection" is not determinative, if the inquiry otherwise meets the standards for a noncriminal investigation.

The OOR determined that the routine inspections at issue do not meet the standards of a "noncriminal investigation" as set out in our precedent for essentially four reasons: 1) because the Boiler Law itself differentiates between "inspections" and "investigations"; 2) because the inspections can be performed by non-Department personnel while the investigations cannot be; 3) the affidavits did not provide sufficient details to show how the inspections met the standards in our case law; and 4) the disclosure here does not raise the same public policy concerns

15

as were present in *Department of Health*. We agree with the OOR that these distinctions are significant, particularly given that "[t]he purpose of the [RTKL] is to promote access to official government information in order to prohibit secrecy, scrutinize public officials' actions and make them accountable for their actions," *Dages v. Carbon County*, 44 A.3d 89, 91 (Pa. Cmwlth. 2012), and that exemptions are to be read narrowly, *Pennsylvania Department of Education v. Bagwell*, 131 A.3d 638, 646 (Pa. Cmwlth. 2016).

First, the Boiler Law distinguishes between a "field inspection" and an "investigation." Section 9 provides for "inspections," while Sections 14 and 15 provide the procedures of "investigations." Before delving into the differences between the two functions, we note that the "polestar indication of the legislature's intent is the plain language of the statute." *SugarHouse HSP Gaming, L.P. v. Pa. Gaming Control Bd.*, 162 A.3d 353, 375 (Pa. 2017). Based on the use of the different terms throughout the Boiler Law, the legislature's intent was that they would be separate and distinct. Within Section 2 of the Boiler Law, 35 P.S. § 1331.2, a "Field inspection" is defined as "[a]n internal/external inspection as defined by the National Board Inspection Code." In contrast, an investigation is not defined. Our Supreme Court has repeatedly held that "when the legislature uses two different words, we must [] presume that it must have meant for the words to have two separate meanings." *Commonwealth v. Elliott*, 50 A.3d 1284, 1290 (Pa. 2012) (internal quotation marks omitted); *see also PECO Energy Co. v. Commonwealth*, 919 A.2d 188, 191 (Pa. 2007) ("[T]he Legislature is presumed to understand that different terms mean different things.").

The distinction is more evident when reviewing the Boiler Law. Inspections must conform to an established schedule set out by the Boiler Law, unless

16

specially altered by the Department. 35 P.S. § 1331.10. The inspections need not be performed by the Department. 35 P.S. § 1331.9. Rather, when a field inspection is to be performed, an owner may choose from three types of inspectors—an inspector employed by an insurance company, an inspector employed by the owner, or a commissioned private inspector hired by the owner to complete the inspection – none of whom are employed by the Department. *Id.* While these inspectors must hold a Commission from the Department, 34 Pa. Code § 3a.111, there is nothing in the Law that provides they are under the employ or control of the Department or are agents thereof. In contrast, an investigation is always under the purview of the Department and performed by the Department itself. *See* 35 P.S. § 1331.14(a). The Boiler Law provides the Department possesses the **sole** authority to **investigate** any violations of the Boiler Law, and concomitantly, the Department also has the right of entry to perform its enforcement duties. 35 P.S. § 1331.14.

The fact that the Department is charged with investigations, but may delegate the duties of regular inspections to be performed by independent inspectors is telling. The ability to delegate inspection authority differs from the inspections in *Department of Health*, where the inspections were **made by DOH** or one of its authorized agents under the HCFA. *Dep't of Health*, 4 A.3d at 811 (citing Section 813(a) of the HCFA, 35 P.S. § 448.813(a) ("any authorized agent of the department . . . .")). Similarly, in both *Michak*, 56 A.3d at 926 and *Gilbert*, 40 A.3d at 759, the respective agencies performed the inspections. Here, the Department does not contend that the inspectors hired by the owner of the boiler were authorized agents of the Department. Nor does the Department contend that

17

the inspections at issue were performed by a Department inspector pursuant to Section 9(d) of the Boiler Law.

Furthermore, the attestations do not meet the burden of showing how these inspections meet the standards for noncriminal investigations as set forth in our precedent. In the attestations, Mr. Kegg stated: "The procedures that BOIS generally employs when investigating a boiler-related incident or conducting periodic safety inspections include carefully testing specified parameters of the relevant equipment and interviewing maintenance people and others with knowledge of the recent operation of the equipment." (R.R. at 36a.) Mr. Kegg further stated that the inspection reports at issue "provide information regarding the equipment inspected; whether it passed or failed inspection; specific location in the plant; manufacturer; and a description of any deficiencies found by the inspector." (*Id.*) Mr. Kegg only lists what the safety inspection reports entail and gives a very general description of what the Department does in both investigations and inspections. Importantly, Mr. Kegg also does not distinguish between what a routine field **inspection** involves compared to an **investigation** of boiler-related incidents, notwithstanding that the statute distinguishes between the two activities.

In contrast, in *Department of Health,* we described the required inspections as:

> visiting and inspecting the building, grounds, equipment and supplies of a nursing home; reviewing records of the nursing home and patients; and observing and interviewing patients and staff of the nursing home. Moreover, these activities are conducted in order to assess a nursing home's compliance with statutory and regulatory provisions and determine if any corrective and/or disciplinary action needs to be taken. Similarly, the Surveys performed by the Department involve a team of Surveyors who: examine medical records of residents; interview residents, staff, and family members; and make observations of a facility, which include observing

18

medication preparation and administration and dining area and eating assistance practices. These activities are conducted in order to assess whether a nursing home is providing the quality of care mandated by law. Thus, in conducting the Inspections and Surveys, the Department is making a systematic and searching inquiry, a detailed examination, and an official probe with regard to a nursing home's operations and whether such operations are in compliance with the Social Security Act, [42 U.S.C. §§ 301-1397mm,] the HCFA, and the applicable state and federal regulations.

*Dep't of Health*, 4 A.3d at 811 (internal citations omitted).

This comprehensive description of the DOH investigation is much different from the general description of the inspection procedures under the Boiler Law. What the inspections entail, particularly when they are completed by inspectors hired by the owner of the boiler, remains unclear. The attestations here do not demonstrate that "the Department is making a systematic and searching inquiry, a detailed examination, or an official probe," *Department of Health*, 4 A.3d at 811, into operations and compliance with the Boiler Law and controlling regulations. Furthermore, an agency must show that the inspection is within the agency's official duties, *Bagwell*, 131 A.3d at 659-60, and "surpass[es] the [Department]'s routine performance of its duties," *Sherry v. Radnor Township School District*, 20 A.3d 515, 523 (Pa. Cmwlth. 2011). Before us, the Department has not demonstrated that it performed the regular inspections itself or acted in a way that surpassed its routine duties of collecting the inspection reports. The Department cannot rely on broadly stating what investigations and inspections entail because merely stating that an investigation occurred is not sufficient. *Bagwell*, 131 A.3d at 660. Particularly where the inquiry is not referred to as an "investigation," but as an "inspection," such demonstration is important, as there is a presumption that the legislature understood the two different terms had different meanings.

19

*Commonwealth v. Elliott*, 50 A.3d at 1290; *PECO Energy Co.*, 919 A.2d at 191. Mr. Kegg made conclusory statements that the inspection reports "contain information relating to whether or not deficiencies were uncovered by inspectors" and that "they constitute records that would reveal the institution, progress or result of an agency investigation." (R.R. at 36a.) This language mirrors the language present in Section 708(b)(17)(vi)(A) of the RTKL. 65 P.S. § 67.708(b)(17)(vi)(A) ("[r]eveal the institution, progress or result of an agency investigation"). "[A]n affidavit which merely tracks the language of the exception it presupposes is insufficient to demonstrate that the responsive records are exempt from disclosure." *Pa. State Police v. Muller*, 124 A.3d 761, 765 (Pa. Cmwlth. 2015). Without further explanation of what **all of the inspections** entail, whether performed by a Department inspector or an independent inspector, we cannot conclude that the Department has met its burden. Therefore, we agree with the OOR that the Department has "not establish[ed] that the inspections at issue rise to the level of a noncriminal investigation." (Final Determination at 6.)

Finally, the disclosure here does not raise the same public policy concerns as were present in this Court's decision in *Department of Health*. There is no dispute that privacy of health care records and other concerns unique to health care are not present in the case before us as they were in that case. While Mr. Kegg's affidavit mentions that inspections include "interviewing maintenance people and others with knowledge of the recent operation of the equipment," (R.R. at 36a), we agree with the OOR that it is not clear how periodic interviews regarding boiler operations "raise the same concerns about witness confidentiality or harm to reputation" that were present in *Department of Health*. (Final Determination at 6-7.)

20

Accordingly, we will not overturn the OOR's determination that the inspection reports do not fall under the noncriminal investigation exemption, and thus are to be disclosed to Requester. The Department has not provided sufficient evidence as to the inspections, and the special public policy concerns of *Department of Health* are not present in the case before us.[10]

## IV. CONCLUSION

The requested documents that the OOR ordered disclosed do not fall under the noncriminal investigation exemption of Section 708(b)(17) of the RTKL, and thus are public records subject to public disclosure. Accordingly, we affirm the OOR's Final Determination.

**RENÉE COHN JUBELIRER,** Judge

---

[10] The Department also argues that should we determine that the inspections do not fall within the noncriminal investigation exemption, then those inspections would be outside the scope of the Request. Requester responds by asserting that this argument is waived because it was not presented to the OOR. We have previously stated that "an agency must raise all its challenges before the fact-finder closes the record." *Levy v. Senate of Pa.*, 94 A.3d 436, 441 (Pa. Cmwlth. 2014). Challenges or arguments that are not raised before the fact-finder are deemed to be waived. *Id*. at 442. "In the ordinary course of RTKL proceedings, this will occur at the appeals officer stage, and a reviewing court will defer to the findings of the appeals officer." *Id*. We defer here, because this is not the "extraordinary case" in which we become the fact-finder by accepting further evidence and holding our own review or hearing. *Id*. The Department did not raise this argument before the OOR and the appeals officer. Accordingly, the Department cannot raise the new argument before this Court, and it is waived.

21

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Department of Labor and : 
Industry, :
                          Petitioner : 
                                    : 
                 v. :    No. 1583 C.D. 2019
                                      : 
Chester Darlington, : 
                        Respondent : 

# O R D E R

NOW, June 9, 2020, the Final Determination of the Office of Open Records, dated October 16, 2019, is **AFFIRMED**.

                                     _____

                                     **RENÉE COHN JUBELIRER,** Judge